92 Cal.App.3d 796 (1979)
156 Cal. Rptr. 48
In re PHILLIP B., A Person Coming Under the Juvenile Court Law.
RICHARD W. BOTHMAN, as Chief Probation Officer, etc., et al., Plaintiffs and Appellants,
v.
WARREN B. et al., Defendants and Respondents.
Docket No. 44291.
Court of Appeals of California, First District, Division Four.
May 8, 1979.
*799 COUNSEL
Evelle J. Younger, George Deukmejian, Attorneys General, Jack R. Winkler, Philip H. Philibosian, Chief Assistant Attorneys General, Edward P. O'Brien, Assistant Attorney General, Timothy A. Reardon, Gloria F. DeHart, Derald E. Granberg, and William D. Stein, Deputy Attorneys General, for Plaintiffs and Appellants.
Robert A. Baines, S.L. Stagnitto and Robert A. Destro as Amici Curiae on behalf of Plaintiffs and Appellants.
Leonard P. Edwards for Defendants and Respondents.
OPINION
CALDECOTT, P.J.
A petition was filed by the juvenile probation department in the juvenile court, alleging that Phillip B., a minor, came within the provision of Welfare and Institutions Code section 300, subdivision (b),[1] because he was not provided with the "necessities of life."
The petition requested that Phillip be declared a dependent child of the court for the special purpose of ensuring that he receive cardiac surgery for a congenital heart defect. Phillip's parents had refused to consent to the surgery. The juvenile court dismissed the petition. The appeal is from the order.
*800 Phillip is a 12-year-old boy suffering from Down's Syndrome.[2] At birth, his parents decided he should live in a residential care facility. Phillip suffers from a congenital heart defect  a ventricular septal defect[3] that results in elevated pulmonary blood pressure. Due to the defect, Phillip's heart must work three times harder than normal to supply blood to his body. When he overexerts, unoxygenated blood travels the wrong way through the septal hole reaching his circulation, rather than the lungs.
If the congenital heart defect is not corrected, damage to the lungs will increase to the point where his lungs will be unable to carry and oxygenate any blood. As a result, death follows. During the deterioration of the lungs, Phillip will suffer from a progressive loss of energy and vitality until he is forced to lead a bed-to-chair existence.
Phillip's heart condition has been known since 1973. At that time Dr. Gathman, a pediatric cardiologist, examined Phillip and recommended cardiac catheterization to further define the anatomy and dynamics of Phillip's condition. Phillip's parents refused.
In 1977, Dr. Gathman again recommended catheterization and this time Phillip's parents consented. The catheterization revealed the extensive nature of Phillip's septal defect, thus it was Dr. Gathman's recommendation that surgery be performed.
Dr. Gathman referred Phillip to a second pediatric cardiologist, Dr. William French of Stanford Medical Center. Dr. French estimates the surgical mortality rate to be 5 to 10 percent, and notes that Down's Syndrome children face a higher than average risk of postoperative complications. Dr. French found that Phillip's pulmonary vessels have already undergone some change from high pulmonary artery pressure. Without the operation, Phillip will begin to function less physically until he will be severely incapacitated. Dr. French agrees with Dr. Gathman that Phillip will enjoy a significant expansion of his life span if his defect is surgically corrected. Without the surgery, Phillip may live at the outside 20 more years. Dr. French's opinion on the advisability of surgery was not asked.

*801 I
(1) It is fundamental that parental autonomy is constitutionally protected. The United States Supreme Court has articulated the concept of personal liberty found in the Fourteenth Amendment as a right of privacy which extends to certain aspects of a family relationship. (United States v. Orito (1973) 413 U.S. 139, 142 [37 L.Ed.2d 513, 517, 93 S.Ct. 2674] [right of privacy includes right of marriage, procreation, motherhood, child rearing, and education]; Roe v. Wade (1973) 410 U.S. 113, 152-153 [35 L.Ed.2d 147, 176-177, 93 S.Ct. 705] [right of privacy extends to child rearing and education]; Wisconsin v. Yoder (1972) 406 U.S. 205, 232 [32 L.Ed.2d 15, 34-35, 92 S.Ct. 1526] [parental right to determine child's religious upbringing]; Eisenstadt v. Baird (1972) 405 U.S. 438, 453 [31 L.Ed.2d 349, 362, 92 S.Ct. 1029] [right to obtain contraceptives]; Griswold v. Connecticut (1965) 381 U.S. 479, 485-486 [14 L.Ed.2d 510, 515-516, 85 S.Ct. 1678] [right to marital privacy]; Skinner v. Oklahoma (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110] [right to marriage and procreation]; Pierce v. Society of Sisters (1925) 268 U.S. 510, 534-535 [69 L.Ed. 1070, 1077-1078, 45 S.Ct. 571, 39 A.L.R. 468] [liberty of parents to direct education of their children]; Meyer v. Nebraska (1923) 262 U.S. 390, 399 [67 L.Ed. 1042, 1045, 43 S.Ct. 625, 29 A.L.R. 1446] [liberty of parents to raise child].) "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." (Prince v. Massachusetts (1944) 321 U.S. 158, 166 [88 L.Ed. 645, 652, 64 S.Ct. 438].)
(2) Inherent in the preference for parental autonomy is a commitment to diverse lifestyles, including the right of parents to raise their children as they think best. Legal judgments regarding the value of child rearing patterns should be kept to a minimum so long as the child is afforded the best available opportunity to fulfill his potential in society.
Parental autonomy, however, is not absolute. The state is the guardian of society's basic values. Under the doctrine of parens patriae, the state has a right, indeed, a duty, to protect children. (See e.g., Prince v. Massachusetts, supra, 321 U.S. 158 at p. 166 [88 L.Ed. 645 at pp. 652-653].) State officials may interfere in family matters to safeguard the child's health, educational development and emotional well-being.
(3) One of the most basic values protected by the state is the sanctity of human life. (U.S. Const., 14th Amend., § 1.) Where parents fail to provide their children with adequate medical care, the state is justified to intervene. However, since the state should usually defer to the wishes of *802 the parents, it has a serious burden of justification before abridging parental autonomy by substituting its judgment for that of the parents.
(4) Several relevant factors must be taken into consideration before a state insists upon medical treatment rejected by the parents. The state should examine the seriousness of the harm the child is suffering or the substantial likelihood that he will suffer serious harm; the evaluation for the treatment by the medical profession; the risks involved in medically treating the child; and the expressed preferences of the child. Of course, the underlying consideration is the child's welfare and whether his best interests will be served by the medical treatment.
(5a) Section 300, subdivision (b), permits a court to adjudge a child under the age of 18 years a dependent of the court if the child is not provided with the "necessities of life."
The trial judge dismissed the petition on the ground that there was "no clear and convincing evidence to sustain this petition."
(6) The rule is clear that the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, p. 4236.) The "clear and convincing evidence" standard of proof applies only to the trial court, and is not the standard for appellate review. (See Crail v. Blakely (1973) 8 Cal.3d 744, 750 [106 Cal. Rptr. 187, 505 P.2d 1027].)
(5b) Turning to the facts of this case, one expert witness testified that Phillip's case was more risky than the average for two reasons. One, he has pulmonary vascular changes and statistically this would make the operation more risky in that he would be subject to more complications than if he did not have these changes. Two, children with Down's Syndrome have more problems in the postoperative period. This witness put the mortality rate at 5 to 10 percent, and the morbidity would be somewhat higher. When asked if he knew of a case in which this type of operation had been performed on a Down's Syndrome child, the witness replied that he did, but could not remember a case involving a child who had the degree of pulmonary vascular change that Phillip had. Another expert witness testified that one of the risks of surgery to correct a ventricular septal defect was damage to the nerve that controls the heartbeat as the nerve is in the same area as the defect. When this occurs a pacemaker would be required.
*803 The trial judge, in announcing his decision, cited the inconclusiveness of the evidence to support the petition.
On reading the record we can see the trial court's attempt to balance the possible benefits to be gained from the operation against the risks involved. The court had before it a child suffering not only from a ventricular septal defect but also from Down's Syndrome, with its higher than average morbidity, and the presence of pulmonary vascular changes. In light of these facts, we cannot say as a matter of law that there was no substantial evidence to support the decision of the trial court.

II
In denying the petition the trial court ruled that there was no clear and convincing evidence to sustain the petition. The state contends the proper standard of proof is by a preponderance of the evidence and not by the clear and convincing test. The state asserts that only when a permanent severance of the parent-child relationship is ordered by the court must the clear and convincing standard of proof be applied. Since the petition did not seek permanent severance but only authorization for corrective heart surgery, the state contends the lower standard of proof should have been applied.
In the case of In re Robert P. (1976) 61 Cal. App.3d 310, 318 [132 Cal. Rptr. 5], the court pointed out that a dependency hearing pursuant to section 600,[4] need not result in a permanent severance of the parent-child relationship. Section 366 (formerly § 729) requires subsequent hearings at periods not exceeding one year until such time as the court's jurisdiction over such minor is terminated. In re Robert P. held that even though the severance need not be permanent the standard of proof was "clear and convincing" and not a "preponderance of the evidence." The statement in In re Christopher B. (1978) 82 Cal. App.3d 608 [147 Cal. Rptr. 390], cited by appellant, that clear and convincing proof is required only when the final result is to sever the parent-child relationship and award custody to a nonparent is dicta. The Christopher court did not remove the child from the parents' custody but simply retained jurisdiction to supervise proper maintenance of the child's environment. (7) The "clear and convincing standard" was proper in this case.

III
Section 353 requires that at the beginning of the hearing on a petition, "[t]he judge shall ascertain whether the minor and his parent or guardian *804 or adult relative, as the case may be, has been informed of the right of the minor to be represented by counsel, and if not, the judge shall advise the minor and such person, if present, of the right to have counsel present and where applicable, of the right to appointed counsel."
Amicus Curiae contends the judge erred in failing to notify Phillip of his right to counsel, thus Phillip was not properly represented.
(8) A minor has a statutory right to counsel. (§ 318.5.) If a minor is already represented by counsel, it is not crucial that a judge inform a minor of his right to counsel. "[I]f either the minor or his parents ... appear without counsel, the judge shall advise the unrepresented party of his rights under this section." (§ 318.5, subd. (d); italics added.)
In the present case, the facts show that a deputy district attorney was representing Phillip at the hearing. He was introduced to the judge as Phillip's attorney. The deputy district attorney proceeded to make an opening statement and continued to represent Phillip throughout the entire hearing.
The judge was under no statutory duty to inform Phillip of his right to counsel when it was evident to the court that Phillip was, in fact, represented by counsel.
The order dismissing the petition is affirmed.
Rattigan, J., and Christian, J., concurred.
A petition for a rehearing was denied June 7, 1979, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied July 19, 1979. Mosk, J., was of the opinion that the petition should be granted.
NOTES
[1] All statutory references are to the Welfare and Institutions Code, unless otherwise stated.
[2] "Down's syndrome or mongolism is a chromosomal disorder producing mental retardation caused by the presence of 47 rather than 46 chromosomes in a patient's cells, and marked by a distinctively shaped head, neck, trunk, and abdomen." (Robertson, Involuntary Euthanasia of Defective Newborns: A Legal Analysis (1975) 27 Stan.L.Rev. 213, fn. 5.)
[3] In other words, a hole between his right and left ventricles.
[4] Section 600 has been repealed and the subject matter is now included in section 300.