[Civ. No. 20369. Third Dist. Jan. 8, 1982.]

In re BERNADETTE C., a Person Coming Under the Juvenile Court Law.
PLACER COUNTY PROBATION DEPARTMENT, Plaintiff and Respondent, v.
PATRICIA C., Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and David Y. Stanley, Deputy State Public Defender, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

**OPINION**

**CARR, J.**—We observe initially that respondent Placer County Probation Department has filed no brief herein. Rule 17 (b), California Rules of Court provides in pertinent part: "If the respondent's brief is not filed within the time prescribed . . . the clerk of the reviewing court shall notify the parties by mail that the case may be submitted for decision on the record and on the appellant's opening brief unless the brief is filed within 30 days after the date of the mailing of the notification or good cause is shown for relief. If the brief is not filed within that period . . . the court may accept as true the statement of facts in appellant's opening brief . . . ." The parties have been notified of the default.[1] We accept the statement of facts in appellant's opening brief, noting, however, that our own independent search of the record supports such factual recitation.

---

[1] We are unable to determine if the failure to file a brief is simply benign neglect or a concession that the appeal is meritorious.

This is an appeal from a jurisdictional order sustaining a petition pursuant to section 300, subdivision (a), Welfare and Institutions Code[2] and from the subsequent dispositional order adjudging the minor in question to be a dependent child of the court, removing her from the custody of her mother and ordering placement in a foster home.

Appellant is a nineteen-year-old unwed mother; the minor was four months of age at the time of filing the petition on November 19, 1980. Physical custody was removed on a finding by the court appellant was incapable, or failed, to provide proper maintenance, training and education for the child.

The facts disclose that in February 1980, appellant, then pregnant, began receiving support services from the Placer County Public Health Services through Nurse Lynn Lothrop. These services were initiated because of appellant's pregnancy and her apparent limited knowledge of good nutrition and other medical aspects of pregnancy. Appellant appeared to the nurse to be either mentally deficient or experiencing emotional problems, and the nurse expressed reservations about the ability of appellant to deal with the stress of caring for a baby.

Appellant's landlady observed her to have poor dietary habits and to be quite immature. However, during her pregnancy, with assistance from the nurse and landlady, appellant's dietary practices improved to an adequate level.

Bernadette C. was born July 22, 1980, at Mercy San Juan Hospital in Carmichael, California. Appellant checked the baby and herself out of the hospital as soon as the attending physician pronounced them fit and released them.

The landlady did not see appellant after the baby was born, and the nurse's home visits ended in mid-July, prior to the birth, and she made no observations of the care provided by appellant to the baby.

Appellant provided regular followup care for her child. When the baby did not retain milk well, she contacted the doctor, who started the baby on the formula Similac. When the baby again demonstrated an in-

[2]Welfare and Institutions Code, section 300, as pertinent provides: "Any person under the age of eighteen years ... is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court: (a) Who is in need of proper and effective parental care or control and has no parent or guardian willing to exercise or capable of exercising such care or control ...."

tolerance to Similac, she again contacted the doctor, who recommended Soyalac, a soy-based formula. Appellant followed the doctor's directions and the baby did well. In early August 1980, the baby had an allergic reaction and was again taken to the doctor, prior to her regular checkup visit. The mother also took the baby to the emergency room of the hospital, when, in August, the baby fell from a bed. Appellant obtained appropriate immunizations for the baby and generally saw that the baby received regular medical care. She was assisted in this regard by Edward Abt, a social worker for the Placer County Welfare Department.

With such support service, which appellant apparently seeks on a regular basis, she is capable of caring for the baby in her home according to Mr. Abt and to Nurse Lothrop.

In November 1980, appellant was visiting in San Francisco when the baby had a seizure. She immediately took her by ambulance to the emergency room of San Francisco General Hospital. An electrolyte test showed the baby's sodium level to be quite low and the chief resident said that this "might" have been caused by the baby's recent diet. For approximately two days prior to the seizure, the mother had been feeding the baby fruit juice because the Soyalac formula had been taken off the market. Appellant intended to contact the doctor to inquire about a substitute formula when she returned home from San Francisco. She knew she could not use regular milk because of the baby's intolerance.

The chief resident, Dr. Goldsobel, found the baby's weight to be low, but within the normal range and that there were no signs of trauma on her body. He wanted to do further tests on Monday, November 19, 1980, because a previous spinal tap contained blood, which is not an unusual finding because of the way the test is performed. He did not recall that he had told appellant of the further tests.

On November 16, 1980, the mother came to the hospital and indicated a desire to take the baby home. She thought the baby had recovered from the illness, and was also concerned that the baby was dressed only in a diaper and was shivering.

The doctor on duty, Dr. Davis attempted to persuade appellant not to take the baby from the hospital, although he gave no specific medical reasons for keeping the baby. After consulting with his supervisor, Dr. Grossman, Dr. Davis allowed her to take the baby, who was in a stable

condition and social service followup was available. Moreover, an examination that morning revealed the baby's breathing was normal. Dr. Davis had appellant sign a form acknowledging she was removing the child against medical advice. This was a precautionary measure routinely employed by the hospital for litigation purposes.

When appellant returned home the next day, she met with her social worker and immediately had a prescription filled for the baby. The following day, the first appointment available, she took the baby to Dr. Hook, who then referred her to Dr. Smith, who diagnosed the baby as having pneumonia and recommended she be hospitalized. Appellant initially refused, saying the baby needed "sunshine and juice." When Dr. Hook also recommended hospitalization, appellant acquiesced and the baby was admitted to the hospital that day.

Her social worker related that appellant was afraid of institutions such as hospitals but she had no reluctance to take the child to the doctor. In approximately one dozen visits to appellant's apartment, he found the home to be clean. It was his opinion that she was an adequate mother and the baby would be safe and thrive.[3]

I

The initial assignment of reversible error is the application of an inappropriate standard of proof by the trial court in both the jurisdictional and dispositional hearings. Appellant asserts the clear and convincing burden of proof is applicable to both hearings, premising this assertion on case law that the clear and convincing evidence standard is required when a section 300[4] hearing may result in the removal of a child from the parent. This assertion ignores the two-phase aspect of hearings pursuant to section 300.[5] The first bifurcated hearing is the jurisdictional hearing at which the issue adjudicated is whether the minor is a person described by section 300. (§§ 300, 350, 358.) The burden of proof in such hearings is a preponderance of the evidence. (§ 355, Welf. & Inst. Code; *In re Lisa D.* (1978) 81 Cal.App.3d 192

---

[3]Later, the mother moved into a small mobilehome on an estate. The dispositional report expressed concern that there was not enough room in the trailer for the child to walk and crawl and there was no telephone.

[4]Hereinafter all citations to statutes are to the Welfare and Institutions Code unless otherwise stated.

[5]The statutory procedure contemplates that if a jurisdictional finding of dependency is made, the court shall then "hear evidence on the question of the proper disposition to be made of the minor." (§§ 356, 358.)

[146 Cal.Rptr. 178]; *In re Jeremy C.* (1980) 109 Cal.App.3d 384, 394, fn. 10 [167 Cal.Rptr. 283].) The second phase is dispositional hearing, at which the issue is placement of the minor. If the disposition ordered is removal of the child from parental custody, the more stringent standard of clear and convincing evidence is required. (*In re Lisa D., supra,* 81 Cal.App.3d at p. 192.)

Confusion in this area has been engendered by an apparent blurring in case law between the jurisdictional finding and the dispositional order. However, a careful reading of such cases as *In re Fred J.* (1979) 89 Cal.App.3d 168 [152 Cal.Rptr. 327]; *In re Robert P.* (1976) 61 Cal. App.3d 310 [132 Cal.Rptr. 5], and *In re Phillip B.* (1979) 92 Cal.App. 3d 796 [156 Cal.Rptr. 48] discloses that in each instance the court was really addressing the issue of what to do with the child and whether the child should be removed from parental custody. Even in *In re Phillip B., supra,* wherein the trial court's denial of the petition to establish dependency was affirmed on appeal, the underlying issue at the dependency adjudication (jurisdictional hearing) was, of necessity, removal of the child from parental control, as the parents refused to consent to surgical procedures alleged to be essential to preserve or prolong the child's life.

The difficulty with requiring the more stringent burden of proof at the jurisdictional hearing if the child is ultimately removed from parental care is that the juvenile court judge or referee must foresee the result of the dispositional hearing and set the standard of proof accordingly. The appellate courts may have the advantage of hindsight but the trial courts do not.

In the instant case the trial court articulated it was employing the preponderance of the evidence standard of proof at the jurisdictional hearing. ■ If there is any substantial evidence to support the finding of the trier of fact, a court of review must sustain that finding. All reasonable inferences to support the findings of the juvenile court must be made and the record viewed in the light most favorable to the order of the juvenile court. (*In re Luwanna S.* (1973) 31 Cal.App.3d 112 [107 Cal.Rptr. 62].)

However, even under the lesser standard of proof and the restrictions imposed on appellate review, we find the evidence to be insufficient to sustain the petition.

## II

■ Appellant also challenges the dispositional order issued pursuant to sections 300 and 726. She asserts this order must be based on a finding by "clear and convincing" proof of parental inability to provide proper care for the child and resulting detriment to the child if it remains with the parent. (*In re Jeanette S.* (1979) 94 Cal.App.3d 52, 60 [156 Cal.Rptr. 262]; *In re Jeremy C., supra,* 109 Cal.App.3d at p. 393.) The court failed to state the standard employed in deciding the dispositional order.

"The question of need to articulate the standard of proof employed by a trial court has recently been addressed by our Supreme Court. In essence it held that where a new standard of proof recently has been announced, or where the issue of the applicable standard is unclear, articulation is required. (See, e.g., *People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 . . .; *People* v. *Jetter* (1975) 15 Cal.3d 407 . . . .) On the other hand, where the issue is well settled, it is presumed that the trial judge applied the appropriate standard and no articulation is required. (*Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 914-915.)" (*In re Fred J., supra,* 89 Cal.App.3d at p. 175.)

It is certainly unclear from the record what standard of proof was applied and we do not perceive the presumption of proper application absent articulation to be applicable. It is more reasonable to assume the court, in the absence of record evidence to the contrary, continued to apply the lesser evidentiary standard in determining to remove the child from its mother's custody. Under the factual setting of this case, we cannot conclude that the error applying the wrong standard of proof was harmless.

## III

■ A further defect in the dispositional order is the failure of the probation office to recommend and formulate a plan for reunification of mother and child. (*In re Jeremy C., supra,* 109 Cal.App.3d at p. 393.) California Rules of Court, rule 1376 (b), provides in part, "Prior to every disposition hearing, the probation officer . . . *shall* prepare a social study of the minor. . . . If a recommendation is made to remove the minor from the home, the probation officer . . . *shall* also include in the social study a recommended plan for reuniting the minor with the family." (Italics added in *In re Jeremy C., supra,* p. 388, fn. 4.) The

Advisory Committee comment on the reunification plan provision of rule 1376 states one purpose of the plan is to "put the family on notice as to what must be accomplished to reunify the family." (Deering's Ann. Rules of Court (1980).)

The probation department report, prepared for the dispositional hearing, stated only, "It would be hoped that whether the minor is returned to the mother or continued to foster care that [the mother] would seek out and attend parenting classes, attend counseling, and possibly re-establish a relationship with the Public Health Nurse ..." The judge commented at trial, "... if you are able to cooperate and put yourself in a position so that you may have the custody of your child again, ... we want it to happen as soon as possible," and "... if she is cooperating with the psychiatric or psychological interviews there can always be a petition before time if the feeling is that she is now ready to have physical custody back again."

A reunification plan among other things must include "specific recommendations for improvements within the home, successful completion of therapy programs, or other conditions for returning the minor to the home." (Deering's Ann. Rules of Court, *supra*.) The probation report states, in terms of hopefulness rather than concrete direction that appellant should seek out and attend parenting classes, attend counseling and reestablish a relationship with the Public Health Nurse. This vague, semiadvisory comment hardly comports with the requirement of specific recommendations to put appellant on notice of what must be done to reunite the family. Nor did the trial judge improve the situation by random comments that "this is a case where the mother can get herself in a position of being able to take the child" and "if she is cooperating with the psychiatric or psychological interviews." (See *In re Jeremy C., supra*, 109 Cal.App.3d at p. 393.)

Appellant had demonstrated that with supportive assistance from community services she could provide reasonably adequate care for her child. A well-defined plan to provide such services and to require appellant to utilize them as a condition of being reunited with her baby is perceived by us as the purpose of the reunification plan and certainly a more desirable alternative to the child and society than placing the child in the alien atmosphere of a receiving home and then propelling her into the foster home syndrome.

## IV

■ Finally, appellant asserts there is insufficient evidence to support the jurisdictional and dispositional order. We agree, cognizant that "[if] there is·any substantial evidence to support the findings of the juvenile court, a reviewing court must uphold the trial court's findings. All reasonable inferences must be drawn in support of the court's findings and the record must be viewed in the light most favorable to the juvenile court's order. [Citation.]" (*In re Jeannette S.* (1979) 94 Cal.App.3d 52, 58 [156 Cal.Rptr. 262].)

The proper evidentiary standard for removing a child from its home and family is whether there was clear and convincing evidence of parental inability to provide care for the child with resulting detriment to the child from remaining with the parent. The focus is on the child's welfare and needs, not the derelictions of the parent. To deprive a parent of custody requires a showing of necessity to avert harm to the child. (Cal. Juvenile Court Practice (Cont.Ed.Bar Supp. —) § 191, p. 53.) "Parenting is a fundamental right, and accordingly, is disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood. Thus, ... '[t]he relationship of ... natural parent ... [and] ... children is a vital human relationship which has far-reaching implications for the growth and development of the child. [Citation.] [T]he involuntary termination of that relationship by state action must be viewed as a drastic remedy which should be resorted to only in extreme cases of neglect or abandonment' [Citations]. [¶] [S]evering the parental relationship [must be] the least detrimental alternative for the children." (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514].)

There is certainly, as a matter of law, insufficient evidence to satisfy the clear and convincing standard. There was no evidence of any physical abuse. There was some evidence of lack of cleanliness in the home, as observed by a landlady immediately after appellant and the baby had moved. The social worker who had contact with appellant after the baby's birth stated that in the 10 to 12 times he visited the home, it was clean.

The apparent reason for removing the child from her mother's custody was Dr. Hook's opinion[6] that appellant could not take care of the child because the child was acutely ill with pneumonia and needed to be

---

[6]Dr. Hook had been told by a Dr. Scheideman, that he had received a call from an unnamed doctor in San Francisco.

in a hospital. Since the child had been cared for in the hospital for the pneumonia condition from the day Dr. Hook convinced appellant this was the necessary medical treatment, this opinion lacks validity and is entitled to little weight.

Inferentially, Dr. Hook feared appellant would remove the child from the hospital against the doctors' wishes, as she had ostensibly done in San Francisco when the baby was hospitalized. At least this was the only specific allegation in the section 300, subdivision (a) petition filed November 19, 1980, for the initial detention of the child and the subsequent jurisdictional and dispositional hearings. The petition, which was the only notice given appellant of the basis of the proposed termination of the mother's custody, recited: "She [Bernadette C.] is in need of proper and effective care and control and has no parent willing or capable of exercising such care and control. The minor's mother removed said minor from the San Francisco Hospital against medical advice of that hospital last week. The baby was taken to Dr. Hook on November 18, 1980, and Dr. Hook advised the natural mother that the minor should be admitted to Auburn Faith. Dr. Hook contacted this department, and feels the mother will attempt to remove said minor, and a protective hold should be issued."

"Notice of the specific facts upon which removal of a child from parental custody is predicated is fundamental to due process ... [and] necessary to enable the parties to properly meet the charges." (*In re Jeremy C., supra*, at p. 397.) We therefore assume the only charge against appellant to justify the removal of her child from her custody by public authorities was speculation that she might take the child, while ill with pneumonia, from the hospital. The record contains no substantial evidence to support this allegation, even under a preponderance of the evidence standard.

The orders appealed from are reversed, and Bernadette C. is ordered returned to her mother, Patricia C.

Reynoso, Acting P. J., and Blease, J., concurred.

On February 5, 1982, the opinion was modified to read as printed above.