[No. F011568. Fifth Dist. Jan. 10, 1990.]

In re STEVE W., a Person Coming Under the Juvenile Court Law.
KERN COUNTY DEPARTMENT OF HUMAN SERVICES,
Plaintiff and Respondent, v.
WANDA B., Defendant and Appellant.

**COUNSEL**

Gregory M. Chappel, under appointment by the Court of Appeal, for Defendant and Appellant.

B. C. Barmann, County Counsel, and Patrick L. Enright, Deputy County Counsel, for Plaintiff and Respondent.

James S. Donnelly, under appointment by the Court of Appeal, for Minor.

**OPINION**

**VARTABEDIAN, J.**—Steve W., an infant, was ordered removed from the physical custody of his mother, Wanda B., essentially because of the slaying of his five-year-old half brother committed by Steve W.'s father, Thomas W.

The mother appeals the dispositional order, claiming that substantial evidence does not support the court's removal of the minor from her physical custody and the adjudication of dependency pursuant to new Welfare and Institutions Code[1] section 300, subdivision (j) was improper. We conclude the new section was properly utilized; however, the removal here was not substantiated by the evidence.

This action was initiated on December 1, 1988, when a petition was filed pursuant to section 300, subdivisions (a) and (d), seeking to declare Steve W. a dependent child of the court. At a contested jurisdictional hearing on December 19, 1988, the petition was found true, and Steve W. was found to be a person described by section 300, subdivisions (a) and (d).

The dispositional hearing was held on January 5, 1989. The social service worker's report recommended that the minor be adjudged a dependent child pursuant to new section 300, subdivisions (a), (b), and (j), which became effective on January 1, 1989. County counsel made an oral motion at the hearing to have the court make its findings pursuant to the new code section. Over the mother's objection, the court found the minor to come within subdivisions (a), (b), and (j) of new section 300 and removed the child from her custody.

### FACTS

Wanda B. lived in a nonmarital relationship with Amos W. (Amos, Sr.) for five years in Arkansas. They had one child, Amos, Jr. (Amos), as a result of this relationship. During this relationship, Amos, Sr., physically abused Wanda. He did not abuse their child. Wanda left Amos, Sr., and began living with Thomas W. Young Amos lived with Wanda and Thomas for a short time and then Wanda relinquished custody to Amos, Sr., so she could get on her feet.

Amos, Sr., retained custody of Amos for over two years until Amos, Sr., stabbed his girlfriend to death and then committed suicide. On April 15, 1988, during the period Amos was living with Amos, Sr., Steve W., the subject of the petition here, was born to Wanda and Thomas. After the death of Amos, Sr., in September 1988, Wanda and Thomas brought Amos to California to live with them. Thomas was unemployed and cared for Amos and Steve while Wanda worked 40 hours a week at the Eden Rock Cafe.

---

[1] All future code references are to the Welfare and Institutions Code unless otherwise noted.

On November 14, 1988, Barbara Long, a social service worker for child protective services, went to the home of Wanda and Thomas to investigate a report that Amos had several facial bruises. After she arrived, she observed that Amos had a black eye, swelling on his forehead, and bruises on his face. Wanda indicated she was not present when Amos was injured. Amos and Thomas had each told her that Amos had been hit by some other children and had also fallen off of his bike into a rosebush. Steve did not have any bruises on this date. Long concluded that Amos's injuries were not consistent with the explanations offered and recommended that he be removed from the home. However, a deputy sheriff did not believe there was enough evidence to remove Amos from the home, and he was not removed.

On November 26, 1988, Amos was brought to Kern Medical Center. He had multiple bruises of varying ages and head trauma. He died on November 27, 1988.

Dr. Jess Diamond, the associate pediatrician at Kern Medical Center, examined Amos after the autopsy. He had bruises on his right thigh, buttocks, left upper chest and head. Death was caused by a blow to the occipital area of the skull. The injury could not have been caused from falling. Dr. Diamond could not find any explanation for the injury other than a deliberate administration of force on the back of Amos's head.

At the time of Amos's death, the bruises on his thigh were seven to nine days old. The bruises on his buttocks were two to four days old and were compatible with being hit with a stick. Photographs of the bruises on Amos's face on November 14, 1988, indicated that only one bruise was consistent with falling; the others were not. One facial bruise had imprint similarities to a broken hairbrush provided authorities by Wanda after Amos's death. Dr. Diamond testified that an untrained person might believe that a fall off of a bike and a fight would be consistent with the bruises observed on November 14, 1988.

Deputy Michael Lage interviewed Wanda and Thomas on November 26, 1988. Thomas said that he became frustrated with Amos because he could not correctly write his ABC's. By his account, he pushed Amos, who then fell and hit his head on the coffee table. Thomas related he next tried to revive him by putting water on his face, taking him outside, slapping his face and beating him on the chest. Thomas admitted that he was responsible for the marks on Amos's buttocks.

Wanda observed the bruises on Amos's buttocks a day or so before he was taken to the hospital. It upset her very much. She asked Thomas what

happened. He said he spanked Amos with a belt, but that it was over and too late to bring it up now. Wanda knew not to push Thomas at that time but planned to bring up the subject later.

Wanda testified that Thomas did not abuse her. He did pick her up by the neck a couple of times, but "it did not last very long." She never saw Thomas hit Amos, and Thomas took good care of Steve. At the time of the December 19, 1988, hearing, Wanda testified that she had no feelings for Thomas, she did not intend to resume a relationship with him, and she hoped he would stay in prison. She was afraid of Thomas based on her past experience with Amos, Sr., and described her relationship with Thomas as pretty good. She had seen people with worse tempers, and she knew "he wouldn't beat me up or nothing like that."[2]

Wanda had begun counseling prior to the dispositional hearing. At the time of the hearing, she was living in a two-bedroom apartment and was self-supporting. She had maintained visitation with Steve as allowed.

DISCUSSION

I.

*Substantiality of the Evidence*

At the dispositional hearing the court followed the recommendation of the social service worker and ordered that Steve be removed from the custody of his parents. The court summarized its viewpoint as follows: "I don't think that she [Wanda] physically has done anything to injure either one of her children. [¶] She's the type of lady, though, that needs a lot of counseling, and I think she needs some support to show a little self-esteem and a little initiative that she doesn't have to rely on this type of scum bag that beats on women and kills kids to support her. And when she learns that and she learns to assert herself and take care of her children, I'm sure that I'd be the first one to return her children to her, but I don't think she's ready for that right now. I think I'm going to follow this recommendation."

Wanda's counsel agreed that she should undergo counseling, but urged that this could be done concurrently with the return of the child.

To this the court responded: "Obviously, if everything was absolutely perfect it probably could. As you know, the welfare department can't,

---

[2] Thomas W. was found guilty of felony child abuse (Pen. Code, § 273a, subd. (1)) and involuntary manslaughter (Pen. Code, § 192, subd. (b)). He received a six-year prison term. His appeal is currently pending in our court (F012308).

doesn't have that type of supervision, unfortunately, and, of course, merely by making an order, as you know—if one percent of my orders are followed, I'd surely think it would be a great thing to happen. So I'm not willing to take that gamble at this point. I think six months will do everybody some good at least."

Wanda concedes the adjudication of dependency was warranted. █ But, both she and Steve, through independent counsel, contend the removal of Steve from her custody was erroneous as there was no showing of substantial danger of harm. Wanda argues that she was not present when the injuries occurred, she made inquiries concerning the nature of the injuries, she assisted in the prosecution of Thomas, she expressed her desire never to have anything to do with Thomas, she is employed, and she has moved into an apartment suitable for raising Steve. She asserts the court's ruling was based upon pure speculation that she may find herself in a similar relationship, and such speculation is insufficient to justify an order of removal. Wanda further argues that the evidence was insufficient to support the court's finding that the lack of preplacement services was reasonable due to an emergency situation.

Counsel for the minor additionally points out there was no reason to believe that Thomas would be released from custody soon and there was no testimony that Wanda was involved with anyone; also, Wanda was self-supporting and therefore was not likely to become dependent upon someone else. The minor contends the court's conjecture that there was no agency to supervise Wanda and fear that its orders would not be followed will not suffice to uphold a removal order. The minor finds further fault with the court's not fully considering all possible alternatives.

█ "It is well settled that our review on this issue is limited to whether the judgment is supported by substantial evidence. Issues of fact and credibility are questions for the trial court, not this court. [Citation.] 'The rule is clear that the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact.' [Citation.]" (*In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1132 [200 Cal.Rptr. 789].)

█ "A parent's right to the care, custody and management of a child is a fundamental liberty interest protected by the federal constitution. [Citation.] 'Parenting is a fundamental right, and accordingly, is disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood.' [Citation.] 'In furtherance of these principles, the courts have imposed a standard of *clear and convincing* proof of parental inability to

provide proper care for the child and resulting detriment to the child if it remains with the parent, before custody can be awarded to a nonparent.' [Citation.]" (*In re James T.* (1987) 190 Cal.App.3d 58, 64 [235 Cal.Rptr. 127].)

Section 361 sets forth the limitations and guidelines to be utilized in removing a minor from the physical custody of his parents. It provides in pertinent part:

"(a) In all cases in which a minor is adjudged a dependent child of the court on the ground that the minor is a person described by Section 300, the court may limit the control to be exercised over the dependent child by any parent or guardian and shall by its order clearly and specifically set forth all such limitations. The limitations shall not exceed those necessary to protect the child.

"(b) No dependent child shall be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated unless the juvenile court finds clear and convincing evidence of any of the following:

"(1) There is a substantial danger to the physical health of the minor or would be if the minor was returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' or guardians' physical custody. The fact that a minor has been adjudged a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left in the custody of the parent or guardian with whom the minor resided at the time of injury.

". . . . . . . . . . . . . . . . . . . . .

"(c) The court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . . The court shall state the facts on which the decision to remove the minor is based.

". . . . . . . . . . . . . . . . . . . . ."

We feel compelled to initially recognize that removal of a child from the custody of a parent, even if temporary, is a drastic measure. The court in *In re James T.* observed on its facts as follows: "There was no evidence the alleged conflicts 16-year-old James experienced with Mother resulted in extreme anxiety, depression, withdrawal, or untoward aggressive behavior. (Welf. & Inst. Code, § 361, subd. (b)(3).) He expressed the doubts, dissatisfaction, and confusion echoed universally by adolescents.

Unfortunately, his unhappiness was compounded by Mother's economic instability and the lingering animosity she harbored toward James's father. However, the composite of these facts falls far short of the statutorily defined cases justifying state intervention to sever, if even temporarily, the parent-child relationship." (*In re James T., supra*, 190 Cal.App.3d at p. 65.)

In *In re Jeannette S.* (1979) 94 Cal.App.3d 52 [156 Cal.Rptr. 262] we reversed an order removing the physical custody of the minor from the parents, noting the importance of considering reasonable alternatives. Jeannette's parents, Frank and Margery, were divorced. Margery had custody of the minor and Frank regularly exercised visitation rights. (*Id.* at p. 55.) Margery had a limited income, above average intelligence, suffered chronic anxiety, and had a somewhat schizoid personality. "[H]er relationship with Jeannette is a close and loving one." (*Id.* at p. 56.) Margery requested visits from a public health nurse, who instructed her on child care. She also had some limited homemaker assistance from the welfare department. Margery requested further help with her home, triggering dependency proceedings. The residence was a "filthy home," which contained extensive animal feces, spoiled food, and an odor of urine. Jeannette was in good health and showed no signs of trauma or abuse. (*Ibid.*) Frank, the father, had a good relationship with Jeannette. He lived with Mr. and Mrs. Christiansen in a two-bedroom, one-bath home. Frank had unstable employment, problems with alcohol, and a lack of parenting skills. (*Id.* at pp. 57-58.) Mrs. Christiansen was ready and willing to care for Jeannette if Frank were awarded custody. (*Id.* at p. 57.) Jeannette was removed from the custody of the parents and placed in the custody of the Department of Human Resources. (*Id.* at p. 55.) Margery appealed. We reversed the dispositional portion of the judgment.

"The clear and convincing standard was not met in the instant case. First, the juvenile court had two reasonable alternatives available to it short of awarding custody to the Department. It could have returned Jeannette to her mother under stringent conditions of supervision by the welfare department with the warning that if she again let her house get filthy or failed to keep Jeannette in clean clothes and to properly care for her that appellant would lose custody of the child. Moreover, the trial court could have ordered the removal of some or all of the animals at appellant's residence as a condition of returning Jeannette to her mother. It could have ordered homemaker service to assist appellant in keeping her home clean; the fact that she had received some assistance for the two weeks preceding the January 5 incident does not demonstrate a total incapacity to benefit from future homemaking service in light of the fact that she had received no such assistance in the preceding one-and-a-half-year period. Moreover, the trial court should have ascertained the cause of the difficulty between appellant

and the homemaker which triggered appellant's request for help from the Department on January 5. Perhaps, another homemaker would have been successful in getting appellant to clean her house—at least the possibility that this could be accomplished should have been explored. If stringent supervision of appellant's activities with reference to Jeannette did not provide a suitable home environment, then the court could remove Jeannette from the custody of her mother.

"Second, assuming the trial court had a reasonable basis for concluding that appellant was incapable of providing a suitable home for Jeannette, it could have placed Jeannette with her father and the Christiansens. Frank offered an alternative home to Jeannette. The fact that the home was small, that Frank was unemployed and that he had a drinking problem does not support a finding that it would be detrimental to Jeannette for her to be with her father and the Christiansens rather than the Department. The presence of Mrs. Christiansen in the home would have alleviated any concern arising from Frank's alcoholism and arrest for child molesting 13 years earlier. Apparently, Frank recognized this when he asked the Christiansens to move in with him. Again, under the trial court's broad powers of supervision over Jeannette and her home environment (§ 362), it could have monitored Jeannette's progress in her father's home to assure her protection." (*In re Jeannette S., supra*, 94 Cal.App.3d at pp. 60-61.)

Where the issue has involved physical abuse of children, the courts' concerns have focused largely on safeguarding minors from repeat attacks. In *In re Van Vlack* (1947) 81 Cal.App.2d 838 [185 P.2d 346] the minor was molested by the stepfather, and the mother was aware of this. The stepfather entered a guilty plea to contributing to the delinquency of a minor. The mother took the minor with her to Ohio, and the wardship petition was dismissed. The mother soon returned to California with the minor and resumed living with the stepfather. A new petition was filed and the minor was removed from the mother's custody. She appealed, claiming the evidence was insufficient to support the judgment. (*Id.* at pp. 838-839.)

The appellate court affirmed the judgment, stating: "The main purpose of the Juvenile Court Act is to safeguard the morality and character of children of tender years. In the circumstances presented by the record herein, it was within the discretion of the court to find that the welfare of the minor required that she be taken from the custody of her mother, in order to protect her from possible repetitions of the acts of the stepfather which had occurred in the past, and to the repetition of which the mother was subjecting her by taking her to live in the same house with the stepfather." (*In re Van Vlack, supra*, 81 Cal.App.2d at p. 842.)

Removal was upheld under similar circumstances in *In re Tracy Z.* (1987) 195 Cal.App.3d 107 [240 Cal.Rptr. 445]. In *Tracy Z.* the three minor children were molested by the father, and the mother was aware of the molestations. (*Id.* at pp. 110-111.) The parents continued to dispute the evidence of molestation, and during the 10-month period between the commencement of proceedings and the dispositional hearing did not participate in any counseling or treatment. (*Id.* at pp. 113-114.) The children were removed from the physical custody of their parents at the dispositional hearing. (*Id.* at p. 110.) The father appealed, claiming the dispositional order should not be upheld because the court failed to consider less drastic alternatives than removal. (*Id.* at p. 113.) The appellate court disagreed. "Given the nature of the proven abuse to which the minors had been subjected while in the custody of their still unrepentant parents, the court had no alternative but to remove them from the home." (*Id.* at p. 114.)

Although the questions of whether a finding of dependency should be upheld and of whether the child should be removed from the custody of the parent are distinct and separate steps in the proceedings, an analysis of cases determining dependency is helpful to our determination.

In *In re Nicole B.* (1979) 93 Cal.App.3d 874 [155 Cal.Rptr. 916], Sylvia B., the mother of Nicole B., lived with Joseph Cien for approximately three months. During Sylvia B.'s absence and without her knowledge, Joseph hit Nicole B. At the time of the jurisdictional hearing, Joseph no longer lived with Sylvia. The court declared Nicole B. to be a dependent child of the juvenile court. The mother appealed. (*Id.* at pp. 876-877.) The court upheld the dependency finding because "there is nothing in the record indicating he [Joseph] has expressed a willingness not to return and the close association with Sylvia in the past provides a basis for inferring there is a potential he may return." (*Id.* at p. 879.) "The mother was awarded physical custody on the condition she would no longer have contact with Cien." (*Id.* at p. 882.)

"It is likely the child will not be removed from her family home if all goes as is now presumed. In reading the probation report, however, we can understand why the court would want to continue jurisdiction and keep a watchful eye on the child. It can be inferred from the fact the three were living together for some time the mother must have had some inkling of Cien's violent propensities. For the best interests of this child, it was appropriate to keep the home under some observation by a responsible agency. There was no abuse of discretion for the court to proceed as it did for the best interests of this child." (*In re Nicole B., supra*, 93 Cal.App.3d at p. 882.)

*In re Jennifer P.* (1985) 174 Cal.App.3d 322 [219 Cal.Rptr. 909] presented a situation of divorced parents; Bonnie had primary custody of Jennifer

and Dennis had reasonable visitation rights. Bonnie became concerned about Jennifer's behavior and consulted a psychiatrist, who eventually suspected molestation. This molestation was confirmed later by Jennifer's stating that her father had molested her. Bonnie requested the assistance of the juvenile court to ensure that Dennis had no contact with Jennifer. Bonnie cooperated in the prosecution of Dennis. Bonnie's good parenting abilities were not in dispute. She later objected to being subject to the continuing jurisdiction of the court. The court declared Jennifer a dependent child of the court. Bonnie appealed. (*Id.* at pp. 324-325.)

Distinguishing *In re Nicole B., supra*, 93 Cal.App.3d 874, the court reversed the dependency finding because "[t]here must be some reason to believe the acts may continue in the future." (*In re Jennifer P., supra*, 174 Cal.App.3d at p. 326.) The court characterized *Nicole B.* just on the side of the line sufficient to support juvenile court jurisdiction, but the case of *Jennifer P.* turned on the fact that there was no indication the mother would allow Dennis to return and had been divorced from him for some time. (*Id.* at p. 327.)

In *In re Bernadette C.* (1982) 127 Cal.App.3d 618 [179 Cal.Rptr. 688] the court reversed an order of dependency. There was evidence of some lack of cleanliness in the home and a fear the mother might remove her ill child from the hospital. The mother had on a previous occasion removed the minor from the hospital but shortly thereafter consulted a physician. (*Id.* at pp. 627-628.) The court concluded that speculation that the mother might remove her child from the hospital did not constitute substantial evidence to support the court's order of dependency. (*Id.* at p. 628.)

One of the factors that the courts have considered in cases where the physical or sexual abuse has not been inflicted by the parent seeking to retain physical custody is the knowledge of abuse by the nonoffending parent. Here Wanda B. was aware of the bruises on Amos's face. She questioned Amos and Thomas about the bruises and received an explanation which Dr. Diamond testified would be believable to an untrained person. When she discovered the bruises on Amos's buttocks, she again asked questions. This time the explanation was not acceptable, but due to Thomas's state of mind, she decided to question him further at a later time. Although Wanda was not completely knowledgeable of the circumstances, she certainly should have been suspicious that something was amiss. Child abuse "may involve a failure to protect the child from harm caused by others." (*In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198].) Demonstrating her concern, Wanda appropriately asked questions when she saw Amos's bruises. Her failure to expediently further inves-

tigate after the second incident was unfortunate but hardly condemning under the circumstances.

Another relevant factor is whether the nonoffending parent allowed or might allow the offending parent to return and continue the abuse. "The more likely it is that the offending parent will have further contact with the nonoffending parent, the more the child's welfare is jeopardized by being placed unsupervised with the nonoffending parent." (*In re V. M.* (1987) 190 Cal.App.3d 753, 757 [235 Cal.Rptr. 506].) Unlike the situations in *Van Vlack, supra,* 81 Cal.App.2d 838 and *Tracy Z., supra,* 195 Cal.App.3d 107, all of the circumstances here indicate that Wanda will not resume her relationship with Thomas or allow him access to the child. Wanda has expressed her clear desire to not have anything to do with Thomas, and she assisted in his prosecution. Furthermore, he has been sentenced to prison for six years. Although Thomas's conviction is not yet final because it is being appealed and cannot be utilized in terms of permanently severing his parental relationship (Civ. Code, § 232; *In re Sonia G.* (1984) 158 Cal.App.3d 18, 23-24 [204 Cal.Rptr. 498]), Thomas is incarcerated at this time. It would not be too onerous to monitor his status to assure that he did not return to the home.

The trial court's concern here was not so much that Wanda would resume her relationship with Thomas but that she would enter a new relationship with yet another abusive type of person. This reasoning is troubling. The facts of this case present an alarming situation, which in turn justifiably caused the court to proceed with utmost caution. It is not unreasonable to be concerned whether Wanda would enter a relationship which might threaten Steve's well-being. But, the court cannot make this a basis of removing the physical custody of the child from the parent if its decision is based on pure speculation. It must be based on substantial evidence. There was evidence that Wanda's selection of partners was not conducive to the raising of children as evinced by her two previous relationships. All other factors, however, support a finding that she would not enter a relationship detrimental to Steve. At the time of the hearing Wanda had begun counseling, she was living in an adequate apartment and was self-supporting. There was no evidence that she was then involved in a relationship with anyone. As previously set forth in *In re Bernadette C., supra,* 127 Cal.App.3d 618, speculation about the mother's possible future conduct is not even sufficient to support a finding of dependency much less removal of the physical custody of the child from the parent. The court's conclusion here is supported by little more than speculation, and such does not suffice as substantial evidence to support removal.

Furthermore, it is unjustifiable for a court to base its finding on the unsubstantiated belief that its orders would not be followed. Perhaps the

court is expressing its frustration over disobedience of orders in unrelated cases. In the case here, Wanda had exercised exemplary effort to resume her parenting of Steve. In addition to her employment, living and counseling arrangements already discussed, she had cooperated with law enforcement in the handling of the case against Thomas and followed the visitation schedule with Steve that was ordered. There was no evidence to indicate that she would not follow the court's orders. Also, there was no proof presented below, other than the court's bare assertion, that some type of supervision was not available to ensure that Wanda was not engaged in a harmful relationship.

Furthermore, as previously set forth in *In re Jeannette S., supra*, 94 Cal.App.3d 52, 60-61, the trial court has the ability to provide stringent conditions of supervision and close monitoring of the minor.

The trial court's broad powers are set forth in section 362, subdivision (a), which provides: "(a) When a minor is adjudged a dependent child of the court on the ground that the minor is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the minor, including medical treatment, subject to further order of the court."

Finally, we find support for the mother's position in the previously discussed cases of *Nicole B., supra*, 93 Cal.App.3d 874 and *Jennifer P., supra*, 174 Cal.App.3d 322. While both involved the question of whether an order of dependency was justified, factual similarities warrant application here. *Nicole B.* is akin to the case here because it can be inferred that Wanda "had some inkling" of Thomas's violent propensities. Yet, the court in *Jennifer P.* characterized *Nicole B.* as just on the side of the line sufficient to support the juvenile court's finding of dependency. If it is so close on a mere dependency finding, then clearly a finding of removal, which has a higher burden of proof, would not be justified by the situation here.

The clear and convincing standard justifying removal was not met in the instant case. The court's basis for removal was founded chiefly on speculation. Additionally, there was no evidence that less drastic alternatives could not be successfully implemented to sufficiently protect Steve's well-being.

We note, in passing, that the court's limited finding that lack of preplacement services was reasonable due to an emergency situation was substantiated.

## II.

*Adjudication Pursuant to New Section 300, Subdivision (j)*

The petition here was filed in 1988 and alleged that Steve was a dependent child of the court pursuant to subdivisions (a) and (d) of section 300. At that time, section 300 provided in pertinent part:

"Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:

"(a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising care or control, or has no parent, guardian or custodian actually exercising care or control.

". . . . . . . . . . . . . . . . . . .

"(d) Whose home is an unfit place for him or her by reason of neglect, cruelty, depravity, or physical abuse of either of his or her parents, or of his or her guardian or other person in whose custody or care he or she is.

". . . . . . . . . . . . . . . . . . ."

Steve was adjudged a dependent child pursuant to these subdivisions at the jurisdictional hearing in 1988.

Section 300 was revised, with the new version effective on January 1, 1989. The dispositional hearing was set for January 5, 1989. The social service worker's report requested the court to declare Steve a dependent of the court pursuant to new section 300, subdivisions (a), (b), and (j). New section 300 provides in pertinent part: "Any minor who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court.

"(a) The minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm inflicted nonaccidentally upon the minor by the minor's parent or guardian. For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the minor or the minor's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm. For purposes of this subdivision, 'serious physical harm' does not include reasonable and age appropriate

spanking to the buttocks where there is no evidence of serious physical injury.

"(b) The minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the minor, or the willful or negligent failure of the minor's parent or guardian to adequately supervise or protect the minor from the conduct of the custodian with whom the minor has been left, . . .

". . . . . . . . . . . . . . . . . .

"(j) The minor's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the minor will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the minor.

"It is the intent of the Legislature in enacting this section to provide maximum protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to protect children who are at risk of that harm. This protection includes provision of a full array of social and health services to help the child and family and to prevent reabuse of children. That protection shall focus on the preservation of the family whenever possible. Nothing in this section is intended to disrupt the family unnecessarily or to intrude inappropriately into family life, to prohibit the use of reasonable methods of parental discipline, or to prescribe a particular method of parenting. . . .

". . . . . . . . . . . . . . . . . . ."

At the dispositional hearing, county counsel requested the court to make its findings under the new section. To this Wanda's counsel responded: "First of all, I question whether or not the Court can adjudge the minor a dependent under the new sections A, B, J in that there was no petition filed under A, B, and J. There was a petition filed under A and D. So, on technical grounds, I don't know if that can be done at this point." There was no further argument regarding this section.

The court made the following finding: "Adjudge the minor to be a dependent child of the court under the new sections, 300 big A, big B, and big J,

too, new one of the Welfare and Institutions Code where the minor be placed in the care, custody and control of the Kern County Department of Human Services."

 Wanda contends that it was error to adjudge Steve a dependent child of the court pursuant to section 300, subdivision (j) because this subdivision was not retroactive and there was no notice or opportunity to be heard. She further asserts that the court cannot make an adjudication pursuant to subdivision (j) without properly amending the petition.

The Judicial Council adopted California Rules of Court, rule 1360 (technically amended and now rule 1439) as a transitional rule for section 300 petitions. Rule 1439 provides in pertinent part:

". . . . . . . . . . . . . . . . . . . . . .

"(b) If a jurisdiction hearing occurred on or before December 31, 1988, sustaining a petition under the subdivision lettering of section 300 then in effect and if the disposition hearing does not occur until after January 1, 1989, the court shall determine if the facts in the sustained petition are sufficient to declare the child a dependent under section 300 as revised effective January 1, 1989.

"If the court determines that the petition contains a statement of facts sufficient to declare the child a dependent within the definition of any subdivision of revised section 300, the court shall make findings, noted in the minutes that the factual allegations of the petition are sufficient to declare the child a dependent under one or more of subdivisions (a), (b), (c), (d), (e), (f), (g), (h), (i), or (j) of section 300 as revised effective January 1, 1989.

"If the court orders and adjudges the child to be a dependent child of the court, the court shall specify in its findings and orders the revised subdivisions and shall read to those present the relevant language of each sustained subdivision.

"(c) If the court determines that the petition does not contain a statement of facts sufficient to support a conclusion that the child is a person within the definition of any subdivision of revised section 300, the petitioner may file an amended petition alleging the subdivisions of section 300 as revised effective January 1, 1989. If the child is detained at the time an amended petition is filed, a new detention hearing shall be held. Nothing in this rule requires that the child be released prior to the next detention hearing.

" . . . . . . . . . . . . . . . . . ."

Article VI, section 6 of the California Constitution authorizes the Judicial Council to make rules not inconsistent with statutes. If the rule does not transcend legislative enactments or constitutional provisions, it has the force of positive law binding on the court. (*Albermont Petroleum, Ltd.* v. *Cunningham* (1960) 186 Cal.App.2d 84, 89 [9 Cal.Rptr. 405], disapproved on other grounds in *Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18 [210 Cal.Rptr. 762, 694 P.2d 1134].)

Wanda has not provided an argument sufficient for this court to find an exception to the rule. Furthermore, we fail to see anything in the rule that is inconsistent with the statute or the Constitution. Therefore, the petition did not require amendment.

The court made a finding, entered in the minutes, that the child was a dependent under new section 300, subdivisions (a), (b) and (j). Although it did not specifically state that the factual allegations met the new statute, the court did render a sufficient statement, and the petition itself was specific as to allegations of abuse to minor's sibling. Traditionally in juvenile dependency proceedings " '[s]pecific findings need not be made; a general finding that the allegations of the petition are true is sufficient to show the facts upon which the court exercises its jurisdiction.' " (*In re Ammanda G.* (1986) 186 Cal.App.3d 1075, 1081 [231 Cal.Rptr. 372].) In *In re Carrie W.* (1978) 78 Cal.App.3d 866 [144 Cal.Rptr. 427] the statutory finding that an award to the parent would be detrimental was not expressly made. We found that an implicit finding from what was said was sufficient to satisfy the requirement of a finding of detriment, and there was substantial evidence to support the implicit finding. (*Id.* at pp. 873-874.) The same should apply here. Implicit in the court's finding that Steve was a dependent child pursuant to section 300, subdivisions (a), (b) and (j), was the finding that the factual allegations were sufficient under these sections.

The court failed to read the revised subdivisions to those present at the hearing. We determine whether this failure was a due process violation. "Notice of the specific facts upon which removal of a child from parental custody is predicated is fundamental to due process. [Citations.] Notice of the specific facts upon which the petition is based is necessary to enable the parties to properly meet the charges." (*In re Jeremy C.* (1980) 109 Cal.App.3d 384, 397 [167 Cal.Rptr. 283]; *In re Bernadette C., supra,* 127 Cal.App.3d 618, 628.) Here the parties had notice of the specific facts upon which removal was predicated. Wanda objected to the adjudication of dependency under the new subdivisions only on "technical grounds." At no time below or on appeal has she made an argument that she was prejudiced

by any failure of notice. No prejudice is evident. New section 300, and in particular subdivisions (a), (b), and (j), does not appear to list new criteria for adjudging a child a dependent of the court. This new section was enacted to clearly define and clarify the conditions under which the minor can be adjudged a dependent child of the juvenile court. It establishes more specific guidelines for social workers who intervene. (Cal. Legis. Assem. File Analysis, Sen. Bill No. 243 (1987-1988 Reg. Sess.).) Wanda knew the facts underlying the petition. The court merely took these facts from the original petition and conformed its ruling to the new section 300. There was no due process violation.

## DISPOSITION

The judgment is reversed as to the dispositional order removing the physical custody of Steve from Wanda. The trial court is directed to conduct another dispositional hearing in accordance with the principles expressed herein under part I. In all other respects, the judgment is affirmed.

Best, Acting P. J., and Stone (W. A.), J., concurred.