Filed 9/2/14  In re D.J. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re D.J., a Person Coming Under the Juvenile Court Law. | B251615 (Los Angeles County Super. Ct. No. CK96620) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Appellant, v. BRITTANY K. et al., Respondents. | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed August 13, 2014 be modified as follows:

1.  On the caption page delete:  Deputy County Counsel for Respondent and replace with Deputy County Counsel for Appellant.

2.  On page 17, the fifteenth line from the top, delete the word "competent" so that the sentence reads:  Because no evidence (let alone competent testimony) was presented to support a finding by the juvenile court that providing father with reunification services would be likely to prevent re-abuse, or that the failure to attempt reunification with father

would be detrimental to the child, the juvenile court erred in ordering reunification services for father. (See *In re A.M. supra*, 217 Cal.App.4th at pp.1077-1078.)

There is no change in judgment.


_____ _____ _____
           MINK, J.[*]                            MOSK, ACTING P.J.                   KRIEGLER, J.

---

[*]     Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 8/13/14  In re D.J. CA2/5  (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re D.J., a Person Coming Under the Juvenile Court Law. | B251615 (Los Angeles County Super. Ct. No. CK96620) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Appellant, v. BRITTANY K. et al., Respondents. | |

APPEAL from orders of the Superior Court of Los Angeles County, Robert Draper, Judge.  Reversed.

Roni Keller, under appointment by the Court of Appeal, for Respondent Brittany K.

Kimberly A. Knill, under appointment by the Court of Appeal, for Respondent Derick J.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Sarah Vesecky, Deputy County Counsel for Respondent.

INTRODUCTION

Brittany K. ("mother") is the mother of D.J., born in July of 2012. Derick J. ("father") is the minor's father. D.J. came to the attention of the juvenile court after he was hospitalized with severe injuries in various stages of healing. The injuries included traumatic brain injuries, several fractured ribs, detached retinas on both eyes, and a bruised liver and pancreas. When D.J. was admitted into the hospital on November 12, 2012, it was not known whether he would survive. He did survive, but he is severely disabled, with a very short projected life span, and never will ever be able to live an independent life.

The juvenile court sustained a Welfare & Institutions[1] Code section 300 petition pursuant to subdivisions (a), (b) and (e), alleging injuries consistent with inflicted trauma that would ordinarily not be sustained except as the result of deliberate, unreasonable, neglectful acts of the minor's parents, and further alleging that the parents knew or reasonably should have known that the minor was being physically abused and failed to take action to protect him. The parents have not appealed from these findings. The court also dismissed a count pled pursuant to subdivision (b) of section 300, alleging that the parents failed to obtain timely medical treatment for the child's injuries. At the disposition hearing, the court, over the objections of the Department of Children and Family Services ("DCFS") ordered the DCFS to provide the parents with reunification services.

The DCFS appeals from the juvenile court's jurisdictional finding dismissing Count b-2, and the court's order granting the parents reunification services. We reverse the orders of the trial court (a) dismissing the allegations against parents brought under subdivision (b) of section 300; and (b) ordering reunification services for the parents.

---

[1]     All code references in this opinion are to the Welfare & Institutions Code unless otherwise indicated.

2

PROCEDURAL AND FACTUAL SUMMARY

This family first came to the attention of the DCFS after the minor, then almost four months old, was admitted to the emergency room ("ER") of a hospital, where he was found to be suffering from severe injuries, including extensive hemorrhage of the subarachnoid and subdural part of his brain and multiple rib fractures in different stages of healing. Upon admission, the child was placed in the Pediatric Intensive Care Unit and placed on a ventilator. Because the infant had severe swelling of the brain, a right-side ventriculostomy was performed to drain fluids. The treating physician suspected non-accidental trauma. The parents denied any past or present trauma to the minor.

On November 14, 2012, the DCFS received a referral alleging that the minor was the victim of child abuse by an unknown perpetrator. A Children's Social Worker ("CSW") responded to the hospital. The attending doctor informed the CSW that it would be a few days before they would know if the minor would survive. Medical records documented that the minor was initially brought to the ER for shortness of breath. An examination then determined that the minor had several healing rib fractures that were suspicious for non-accidental trauma. The minor also presented with an altered level of consciousness, traumatic brain injury, acute respiratory failure, traumatic cerebral edema, and subdural hematoma. An opthalmology consult was ordered and it was determined that the minor also had multiple acute hermorrhages in both eyes consistent with non-accidental trauma.

The CSW spoke with mother on November 14, 2012. Mother reported that the minor had symptoms of a cold for a week. Mother said that father had been sick so she thought minor had caught his cold. Mother told the CSW she worked and went to school on November 13, 2012, and that at about 9:15 a.m. she received a call from the office at her school informing her that minor was sick. Father said the minor was not feeling well and that he wanted her to meet him so they could take the minor to the doctor. Mother said then when she saw minor he did not seem like himself. He would at times slump over while in his stroller. Mother said that when she would push the stroller over cracks in the sidewalk, the infant cried. While they were on the way to the doctor, mother told

father that she thought they should take the minor to the ER because it was closer, however, father wanted to take him to Dr. Haman, his pediatrician, because she was familiar with the minor. When they arrived at the doctor's office the minor still seemed lethargic, but when Dr. Haman moved the minor's legs around, he opened his eyes and began to appear normal. She examined the minor and diagnosed him with an ear infection and the flu, and prescribed amoxicillin, a cough medication and pedialyte. Mother watched the minor all night and noticed that he was not breathing right. Mother told father at approximately 1:00 a.m. that she believed they should take the minor to the ER; however, she could not find anyone to drive them to the hospital. Father told mother she was panicking, that everything would be fine, and that they would take the baby to the ER later if his condition did not improve. At approximately 4:00 a.m. the infant was still having difficulty breathing so the parents took the infant on the train to the ER.

After medical staff informed mother of the infant's injuries, she said she did not do anything to him and denied knowing that he was hurt. Mother also denied that father harmed the infant, stating they loved him too much. Mother said that she and father sometimes permitted people they stayed with to watch the infant and that they suspected these people harmed him.

The CSW also interviewed father. He said he watched the infant while mother attended school. However, he stated that he started school the prior week and so they had been permitting other people to watch the infant. Father said a maternal uncle watched the infant for approximately 10 minutes while he went to a store around the corner from their residence. He also said that Brittany M. and W.J., both of whom lived at the house at which the parents were staying, sometimes watched the infant. Father confirmed mother's statement about their taking the infant to the doctor and later to the ER.

The CSW spoke with Detectives Sundquist, Gaepa and Tanaka of the Los Angeles Police Department Juvenile Division. The detectives reported that there were some discrepancies in the parents' statements. Mother stated that when she first saw the infant on November 11, 2012, he appeared lethargic, stiff, and with his eyes rolling back, which

was consistent with his condition when he was examined by the ER doctor. However, father said the infant was fine and only had cold symptoms.

Belinda R., a "paternal extended non-relative," informed the CSW that both mother and father had tempers and that father once fell on the infant while he and mother were fighting. On another occasion, she heard that the infant had been dropped. On another occasion, mother and father were fighting while she was in her room, and she sat and talked with them about their conduct for approximately two hours.

On November 15, 2012, the CSW spoke with the hospital social worker, who stated that in addition to other injuries the infant had a bruised liver and pancreas. Though the infant's assessment had not yet been completed, the preliminary assessment was Shaken Baby Syndrome. The next day a CT scan was performed on the infant and it revealed that the child's lungs were bruised and he was bleeding from the spine. The bleeding of the spine was acute. Some of the fractures were as old as four weeks. It was reported by the attending physician, Dr. Murray, that the infant would never be able to do anything on his own, including eating, and would be blind.

On November 18, 2012, it was reported to the parents that the infant had serious brain damage.

Father blamed Brittany M. and W.J. for the child abuse. He said that it must have occurred on November 9, 2012, when he went to the market and they agreed to watch the infant until he returned. He was gone for 20 minutes. He said he suspected they abused the child because they had a strained relationship with mother. He denied physically abusing the infant or witnessing mother doing so.

The Department notes in its assessment of the case that although the parents strongly believed that the infant was abused by Brittany M. and W.J., the infant was found to have several injuries in separate stages of healing, which indicated that the infant's injuries pre-dated November 9, 2012, and occurred before they moved into the house with Belinda R. and her family.

Based on the severity of the infant's multiple injuries and the parent's failure to provide the DCFS with a reasonable explanation as to how they occurred and the

conclusion by the medical staff that the infant's injuries were the result of deliberate/non-accidental trauma, the DCFS recommended that the court sustain a section 300 petition, declare the child a dependent of the court and deny the parents reunification services.

The recommendation that the juvenile court not offer the parents reunification services was based on mother's admission, during the course of the Los Angeles Police Department's investigation, that she (a) previously witnessed father move the infant back and forth and side to side when he was two weeks old, that she heard a popping sound and asked father if he was hitting or shaking the infant; (b) previously witnessed the child become stiff with his eyes rolled back but she did not disclose these symptoms to the pediatrician during her examination of the infant; and (c) reported to the detectives that the infant did not cry, while others said the infant "cried more than he slept." Additional evidence supported the recommendation, including (d) reports by non-related "family" members that the parents fought, that the infant was primarily in father's care, and that father became easily frustrated with the child and would forcefully bounce him up and down stomping and pacing with the infant; (e) a treating doctor at the hospital reported that the infant suffered from a bleed to the brain, left frontal lobe subdural hematoma, from front to back, which injury would require force and, combined with the rib fractures, was consistent with Shaken Baby Syndrome; (f) Dr. Murray, a child abuse expert, reviewed the findings and found the case to be suspicious for non-accidental trauma; (g) Dr. Rosales, the hospital ophthalmologist, stated that the infant had bilateral hemorrhages all the way to the "equator," the worst she had seen in her 30 years as a doctor, which she concluded were the result of the infant being shaken.

Dr. Murray reported on November 16, 2012 that if the infant survived, he would likely be totally dependent on others, unable to see, talk, walk, or eat on his own. She stated that the infant could live into his teens or early twenties, but he would have to be fed via a feeding tube. Even as a teenager he would have to have his diapers changed, and his tracheal tube cleaned.

Both parents denied during their interviews with the police that there were any incidents in which the infant could have been accidentally injured.

6

At the conclusion of the interview, the parents were informed that the infant would be taken into protective custody. Mother cried and father became visibly upset. The detectives subsequently heard loud noises as if someone was banging against a wall. A detective went to investigate and observed father punching walls and yelling. The detective advised father that if he did not calm down he would be escorted out of the hospital. Father responded, "Fuck this! I'm leaving anyway!" The police noted mother's earlier report of father's demeanor, which stated father "was clearly out of control and angry. [Mother] stated to us earlier that she had never seen him los[]e hi[s] temper."

M.W. said mother was very protective of the infant and she did not believe she would hurt the baby. However, she said that father would become frustrated with the infant, and demonstrated that father would hold the infant while he was crying and bounce the infant up and down forcefully in his arms while pacing rapidly through the house stating, "Come on D[.] J[.]! Come on!" She also said that mother was afraid of father and she had witnessed them fighting. She also could hear them fighting and heard banging noises from their room, and on one occasion she saw him trying to snatch the baby from mother's arms.

Belinda R. also stated that father lost his temper all the time. She knew that something was wrong with the baby because he cried all the time, sometimes all night long.

Belinda R. said she went to the hospital when she learned the infant was there. She talked to father, who accused M.W. and W.J. of harming the infant and then stated: "If I get arrest[ed] for this. If the guys in jail think I did this. You know what they will do to me in jail."

Mother said she suspected W.J., Brittany M., and father of hurting the infant. Mother said to the detectives that approximately two weeks after the infant's birth, she woke up and saw father shaking the baby. Mother described the force of the shaking as a four to five on a scale of ten. Mother observed the baby's head move back and forth approximately three times and also heard a "popping sound." Mother said she said to father, "Are you shaking my baby?" and "Did you hit my baby?" Mother said father

7

responded no, and said he was only bouncing him up and down and trying to get him to fall back asleep.

Mother said that D.J. did not look good when she left for school on November 12, 2012. When she met father to take the baby to the doctor, she knew something was wrong because he was stiff and at one point his eyes rolled back. Mother said that on approximately three occasions that night, the infant's arms and legs would become stiff. When a detective told mother that he felt she was minimizing the father's shaking of the infant, mother admitted that in her sleep she kept hearing "popping" sounds, which eventually wakened her.

Dr. Haman, the pediatrician, stated that prior to her examination of the infant on November 13, 2012, the parents had informed her that they had brought the infant in to see the doctor because he was congested, was scratching his right ear, and was coughing. They did not inform her that the child had experienced stiffness, a blank stare, eyes rolling back and had been nonresponsive. If they had, she would have immediately called 911.

On May 2, 2013, a supplemental report was filed with the juvenile court which indicated that D.J. was residing with Tanya G, who was meeting his needs. The report indicated that the infant had "[one-]sided vision loss." [Tanya G.] thought the infant might be able to track shadows, bright lights and colors. The infant was receiving all his feedings through a G-tube.

Tanya G. was closely monitoring the parents' visits, which were scheduled for three times a week for three hours in duration. No problems were reported, though the parents were visiting less frequently than they had been. The CSW witnessed the infant stop crying on one occasion after mother picked him up, rocked him, and kissed him. The infant would cry when the parents left. The parents visits with the infant decreased to the point that Tanya G. informed mother that the infant needed longer visits, and that he benefited from physical and emotional contact with her.

The parents indicated they had completed a 10-week parenting program, but they had not forwarded their Certificates of Completion to the Department. They also said

8

they had enrolled in another parenting class. Mother was attending a program presented by COACH for Kids and Cedar Sinai Medical Center addressing child management. On March 11, 2013, the court ordered the Department to ensure that the parents received proper medical training with respect to the infant's needs. The record does not reflect whether they received that training. It does indicate that father reported that he and mother had identified a medical training course, and they would enroll in it when they were ready.

The jurisdictional hearing took place on May 8, 2013. Except for one sentence contained in the police report, and no other objections being raised, the court admitted into evidence all of the reports and other documentary evidence offered by the Department. The court also admitted into evidence mother's certificate from a therapy clinic, and parents' certificates for attending a parenting class. No witnesses were called, and the court immediately proceeded to closing arguments.

After argument was concluded, the juvenile court made its jurisdictional findings. The court struck Count b-2, the count alleging that the parents failed to obtain timely medical care for the child, and sustained the remainder of the petition as pled.

The allegation sustained by the juvenile court under section 300, subdivision (a) was as follows: "On 11/14/12, 3 month old D[.]J[.] was hospitalized as a result of a detrimental and endangering condition and diagnosed with acute and chronic subdural hemorrhages with extra-axial hemorrhages over the cerebral hemispheres, and extensive bilateral retinal hemorrhages resulting in altered level of consciousness, traumatic brain injury, acute respiratory failure, traumatic cerebral edema and subdural hematoma. The child was also found to have fractures to the child's left posterior seventh and eighth ribs and fractures of the lateral fourth, fifth and sixth ribs with adjacent pleural thickening. The child was found to have bruising to the child's lungs, and bleeding to the child's spine. The child's injuries are in different stages of healing. The child also suffered seizures. [DJ's] mother, Brittany R. K[.] and father, Derick [J.], gave no explanation of the manner in which their child sustained his injuries. The child's injuries are consistent with inflicted trauma. The child's injuries are of such a nature that would ordinarily not

9

be sustained except as the result of deliberate unreasonable neglectful acts of the mother and father who had care, custody and control of the child. The deliberate unreasonable neglectful acts of the parents endangers the child's physical health and safety and places the child at risk of physical harm, damage, danger, and death." Substantially identical allegations were sustained under section 300, subdivisions (b) and (e), the latter with the additional allegation that the parents knew or reasonably should have known that the child was being physically abused and failed to take action to protect the child.

While it was making the jurisdictional findings, the court indicated that it intended to provide both parents with reunification services. The court stated that it believed that it was in the infant's best interests for the parents to receive reunification services. It said that the parents had "reacted heroically in visiting the child." After minor's counsel requested to be heard, the court stated it would deal with this issue during the disposition phase of the hearing.

At the disposition hearing, the DCFS recommended that the court deny both parents reunification services, but also stated that if the court had another view, it could accept that there might be a reason to treat mother differently than father because there were statements in the report to suggest that she was a good mother. Minor's counsel asked the court to deny father reunification services, but to offer them to mother. The parents' counsel submitted on the court's tentative to offer services.

Over the DCFS's objection, the court found by clear and convincing evidence that offering both parents reunification services was in the child's best interests and would likely prevent re-abuse or neglect of the child "in part because parents both are visiting the child on a daily basis and showing th[at] kind of dedication and commitment." The court further stated that it did not think it was a logical argument "to say that because something bad has happened and we have a sustained petition, we shouldn't provide them services to help them along their way."

The DCFS then requested a continuance of the disposition hearing so that it could make recommendations as to what the case plan should include. The court agreed and

10

continued the disposition hearing for the DCFS to meet with the parents to address a case plan.

The case was calendared for a further disposition hearing on July 25, 2013 to address the proposed case plan. When the case was called the DCFS was represented by a different Deputy County Counsel, its prior attorney being out on medical leave. The DCFS asked that the matter be continued for a contested hearing. Mother's counsel objected and stated that the issue of reunification services had already been heard by the court, and that the present hearing was solely to address a proposed case plan to be filed by the DCFS. Father's counsel joined.

After hearing further argument, the court stated, "I am finding best interest of the child and finding there are services available to prevent reoccurrence of the event." The court also found that there was bonding between the child and the parents.

The juvenile court ordered the DCFS to provide the parents with reunification services, to include (a) dyadic parenting for a special needs child; (b) individual counseling to address case issues, including domestic violence and anger management; (c) conjoint counseling; (d) participation in the child's medical appointments; and (e) medical training to meet the child's needs.

## DISCUSSION

1. *Mother's Motion to Dismiss the Appeal*

Mother asserts that the DCFS's challenge to the juvenile court's jurisdictional findings and dispositional orders was untimely, and consequently maintains that the appeal should be dismissed. Specifically, she contends that the court made the findings and orders at issue in this appeal on May 8, 2013, but that the DCFS did not file its notice of appeal until September 4, 2013, after a subsequent hearing was held to permit the DCFS to file a case plan outlining the family reunification services to be provided by the DCFS pursuant to the court's earlier disposition order. The question is thus, did the juvenile court order reunification services on May 8, 2013, or rather, did it simply make a finding that this was an appropriate case in which to do so and put the matter over for

11

further hearing?  We turn to the transcript of the May 8, 2013 hearing to answer this question.

At that hearing, the juvenile court made its intent to order reunification services known, and after argument, found this was "an appropriate case to order [DCFS] to provide family reunification services to both mother and father."  However, the DCFS had failed to file its case plan with the court.  Consequently, the court continued the hearing in order to permit the DCFS to prepare a case plan, including reunification services for the parents.  The court did not order services and complete the disposition hearing until July 29, 2013.  Therefore, because the juvenile court did not order DCFS to provide the parents with reunification services or complete the disposition hearing until July 29, 2013, DCFS's notice of appeal was timely filed on September 4, 2013.  Respondents' motion to dismiss the appeal is therefore denied.

2. *Was there Substantial Evidence to Support the Juvenile Court's Dismissal of Count b-2 of the section 300, subdivision (b) Petition?*

The DCFS contends the juvenile court erred in dismissing Count b-2 of the petition alleging the parents' failure to provide medical treatment.  Section 300, subdivision (b), provides in part:  "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: . . .  (b)(1).  The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, . . . as a result of the negligent failure of the parent, to provide medical treatment."

In the present case, in Count b-2 of the section 300 petition, the DCFS alleged that the infant suffered various serious physical injuries and that "[t]he child's mother, Brittany R. K[.] and father, Derick J[.], failed to obtain timely necessary medical treatment for the child's injuries.  The parents' severe medical neglect of the child endangers the child's physical health and safety and places the child at risk of physical harm, damage, danger and death."

12

In determining the operative facts, the record on appeal is reviewed in the light most favorable to the decision of the trial court. All reasonable inferences to support the findings of the juvenile court must be made and the record reviewed in the light most favorable to the order of the juvenile court. (*In re Bernadette C.* (1982) 127 Cal.App.3d 618, 624.) The appellate court is to review the entire record to determine if there is substantial evidence to support the findings of the lower court. As long as there is substantial evidence, the reviewing court must affirm. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 872-873*; Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429-430.) With the aforesaid guidance in mind, we summarize the evidence presented supporting the trial court's decision to dismiss Count b-2 of the petition, the alleged violation of section 300, subdivision (b), based on the parents' medical neglect.

The parents clearly failed to obtain timely and necessary medical attention for the infant's very serious and disabling injuries. Although the parents took the infant to the pediatrician the day before he was hospitalized with life threatening injuries which have left him severely disabled, they failed to disclose key information and symptoms to the pediatrician, only reporting that the baby was suffering from an upper respiratory infection, thus, rendering her unable to effectively diagnose and treat the child.

Mother and father reported to the doctor when they brought the baby in for diagnosis and treatment that the baby was sneezing and was congested. They failed to disclose, however, that (a) the baby cried inconsolably when touched; (b) when the parents met to take the baby to the doctor, he did not "look right," was completely limp, was not moving, and looked "blank;" (c) was stiff; (d) his eyes rolled back; and (e) he was unresponsive. They did not inform the physician that (a) father had accidentally fallen with the baby; (b) father sometimes burped the baby too hard; (c) the baby suffered a bloody nose after he was slammed against father's knee; and (d) on one occasion mother awoke to find father shaking the then two-week old baby, that she observed the baby's head moving back and forth and she had heard "popping" sounds while she was "asleep." They also chose to take the baby to the doctor's office rather than to an

13

emergency room despite the fact that his eyes were open, he was not blinking, and his legs became stiff.

The doctor confirmed that the parents failed to inform her of the child's most significant and alarming symptoms, and that had they done so, she would have immediately called 911 and ensured that the child was taken to the ER. The failure of the parents to provide this information constituted, at a minimum, extreme neglect, and delayed his receipt of medical attention he desperately needed. Though the parents finally brought the child to the hospital the following morning, this does not excuse their prior conduct.

Based on the evidence summarized above, we hold that the trial court's decision to dismiss Count b-2 of the section 300 petition was not supported by substantial evidence.

3. *Did the Juvenile Court Abuse its Discretion in Ordering Reunification Services for Both Parents?*

The DCFS contends the juvenile court abused its discretion in ordering reunification services for the parents. It maintains there was no competent testimony that services were likely to prevent reabuse; no clear and convincing evidence that reunification services were in D.J.'s best interests; and insufficient evidence that failure to reunify would be detrimental the child.

While offering reunification services is the norm, "[s]ection 361.5, subdivision (b) symbolizes the Legislature's recognition that it may be fruitless to provide reunification services under certain circumstances." (*Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 750, citing *In re Rebecca H.* (1991) 227 Cal.App.3d 825, 837.) Once the court determines that one of the situations set forth in section 361.5, subdivision (b) is applicable, "the general rule favoring reunification is replaced by a legislative assumption that offering reunification services would be an unwise use of governmental resources." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) Although these circumstances are narrow in scope and subject to an enhanced burden of proof, "they demonstrate a

legislative determination that in certain situations, attempts to facilitate reunification do not serve and protect the child's interest." (*Id.* at p. 474.)

Section 361.5, subdivisions (b)(5) and (c),[2] provide that reunification services should not be provided when the court finds, by clear and convincing evidence, that the child was brought within the jurisdiction of the court under subdivision (e) of section 300 because of the conduct of that parent or guardian. (§ 361.5, subds. (b)(5), (c).) Indeed, when section 361.5, subdivision (b) applies, a juvenile court is prohibited from providing family reunification services "unless it finds, based on competent testimony, that those services are likely to prevent reabuse . . . or that failure to try reunification would be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c); *In re A.M.* (2013) 217 Cal.App.4th 1067, 1074-1075, 1077-1078.)

Section 361.5, subdivisions (b)(6) and (c) provide, in pertinent part, that reunification services shall not be provided when the child has been adjudicated a dependent pursuant to any subdivision of section 300 as a result of *severe physical harm to the child*, unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child. (§ 361.5, subds. (b)(6), (c), emphasis added.) "Severe physical harm*"* includes, but is not limited to, "deliberate and serious injury inflicted to or on a child's body by an act or omission of the parent or of another individual with the consent of the parent. . . ." (§361.5, subd. (b)(6).)

A finding under section 361.5, subdivision (c), that reunification would be in the child's best interest is reviewed for substantial evidence. (*In re William B.* (2008) 163

---

[2]    Section 361.5, subd. (c) states: ". . . The court shall not order reunification for a parent or guardian described in paragraph (3), (4), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), or (16) of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interests of the child. [¶]  In addition, the court shall not order reunification in any situation described in paragraph (5) of subdivision (b) unless it finds that, *based on competent testimony,* those services are likely to prevent re-abuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (Emphasis added.)

15

Cal.App.4th 1220, 1229.) The Court of Appeal in *In re William B.*, *supra,* also noted that "[a] juvenile court has broad discretion when determining whether further reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will only reverse that determination if the juvenile court abuses its discretion. [Citation.]" (*Ibid.*)

The reviewing court should interfere only "'if [it] find[s] that under all of the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that [he or she] did.' [Citations.]" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deducted from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" [Citation.] (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

In the present case, it is undisputed that the physical injuries suffered by the child were substantial and severe. We will discuss the reunification issue as to mother and father separately.

 

      a. *Reunification Services for Mother.*

Based on the legal standard set forth above, the evidence presented to the trial court upon which it apparently relied in making its decision to offer mother reunification services was as follows: Mother and child appeared to have bonded to some extent. D.J. apparently recognizes mother and cries when she leaves him in the care of another person. Mother has visited the minor (both in and out of the hospital) on a regular basis. It was the opinion among those who knew mother that she would never do anything to harm the child. She was very protective of the child and was determined that he not end up being institutionalized. She had taken steps to become a better mother including completing a parenting class, and during her monitored visits performed tasks associated with the child's ongoing medical care. At the time of the abuse, the minor was herself a non-emancipated minor.

16

However, we hold none of this evidence, individually or collectively, was sufficient to support a finding that (a) reunification services were likely to prevent re-abuse; (b) the failure to try reunification would be detrimental to the child due to his close and positive attachment to mother; or (c) reunification was in the best interests of the child. (§ 361.5. subd. (c).) Furthermore, none of the aforesaid evidence introduced by mother was in the form of *testimony*, let alone *competent testimony*, as is required by section 361.5, subd. (c).)

b. *Reunification Services for Father.*

Unlike mother, in the case of father, there was no evidence that D.J. was bonded with father, or that he was a supportive parent to the child. Rather, the evidence suggested that father had a low threshold for frustration, was intolerant of the child's crying and responded inappropriately to it by vigorously bouncing the baby up and down, and had significant difficulties controlling his anger. Father presented no evidence that the failure to provide him with reunification services would in any way be detrimental to the child. Because no competent evidence (let alone competent testimony) was presented to support a finding by the juvenile court that providing father with reunification services would be likely to prevent re-abuse, or that the failure to attempt reunification with father would be detrimental to the child, the juvenile court erred in ordering reunification services for father. (See *In re A.M. supra*, 217 Cal.App.4th at pp.1077-1078.)

17

DISPOSITION

The dismissal of the b-2 count of the petition is reversed. The juvenile court's orders of reunification services for mother and father are also reversed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MINK, J.[*]

We concur:



MOSK, ACTING P.J.



KRIEGLER, J.

---

[*]    Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18