Filed 5/20/25  P.G. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| P.G. et al., | |
| Petitioners, | E085475 |
| v. | (Super.Ct.No. DPRI2400295) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Respondent; | [NO CHANGE IN JUDGMENT] |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

THE COURT

The petition for rehearing is DENIED.

The Court ORDERS the opinion filed on April 28, 2025 modified as follows:

1. On page 13 of the opinion, in the first sentence of the last paragraph, which begins with "The social worker interviewed," replace "20224" so that it now reads:

2024

1

2. On page 24 of the opinion, delete the first full paragraph, which begins with "Third, the record contains," in its entirety and replace it with the following:

Third, the record contains evidence that no one other than the parents could have inflicted K.G.'s injuries. When DPSS received the immediate response referral, K.G. was just two months old. Mother was K.G.'s primary caregiver, but Father cared for K.G. alone sometimes as well. The detention report contains evidence that K.G. had not been in the care of anyone other than the parents for approximately one month before he was taken to the emergency room, and the medical evidence showed that all of the bone fractures other than the skull fracture had occurred no more than two weeks before that emergency room visit. To the extent that there was any evidence of another possible perpetrator, it was weak and equivocal. First, the maternal great-grandmother cared for K.G. for 30 minutes to an hour on one occasion that may or may not have been within two weeks before the emergency room visit, and there is no evidence that K.G. showed signs of distress immediately afterward. And second, Father reported that the maternal grandmother cared for K.G. for a few hours at an amusement park, but "'they were in a public place the entire time,'" so Father was "'not concerned about that.'"

3. On page 24 of the opinion, in the first sentence of the paragraph beginning with "Taken together," replace the phrase "the lack of any possible perpetrators" with the following:

the evidence that there were no possible perpetrators

4. On page 27 of the opinion, in the first paragraph, which begins with "Mother argues that," replace the sentence beginning with "Given the uncontested medical evidence" in its entirety with the following sentence:

Given the uncontested medical evidence that K.G.'s injuries were caused by physical abuse and the evidence that the parents were the perpetrators, it is not reasonably probable that the court would have placed K.G. with one or both parents if it had been required to be more explicit about the facts supporting removal.

5. On page 28 of the opinion, in the paragraph that begins with "As with the jurisdictional findings," replace the phrase in the second sentence that reads "there was no evidence of an alternative perpetrator who might" with:

there was evidence that no alternative perpetrator might

2

6. On page 29 of the opinion, in the paragraph that begins with "The parents' contrary arguments," in the second sentence of that paragraph, replace the phrase "First, Mother argues that," with:

First, the parents argue that

7. On page 30 of the opinion, in the first full paragraph, which begins with "Second, the parents challenge," replace the phrase in the second sentence of that paragraph that reads "But because the parents do not challenge the" with:

But because the parents present no meritorious challenge to the

Except for these modifications, which do not affect the judgment, the opinion is unchanged.

MENETREZ _____
J.

We concur:

MILLER _____
Acting P. J.

CODRINGTON _____
J.

3

Filed 4/28/25  P.G. v. Superior Court CA4/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| P.G. et al., | |
| Petitioners, | E085475 |
| v. | (Super.Ct.No. DPRI2400295) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Dorothy McLaughlin, Judge.  Petition denied.

Dawn Shipley for Petitioner, P.G.

Law Offices of Arthur J. LaCilento and Arthur J. LaCilento for Petitioner, R.A.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Catherine E. Rupp, Deputy County Counsels, for Real Party in Interest.

1

R.A. (Mother) and P.G. (Father) petition for extraordinary writ review of an order setting a hearing under Welfare and Institutions Code section 366.26. (Welf. & Inst. Code, § 366.26, subd. (*l*) [unlabeled statutory citations are to this code]; Cal. Rules of Court, rule 8.452.)

At the jurisdiction and disposition hearing, the juvenile court took jurisdiction over the parents' child under section 300, subdivisions (b)(1) and (e)(1). The court then removed the child from the parents' custody, bypassed the parents for reunification services, ordered monthly supervised visitation, and set the section 366.26 hearing. The parents challenge the sufficiency of the evidence supporting the jurisdictional findings, the removal order, and the bypass order. We conclude that the parents' arguments lack merit, and we accordingly deny the petition.

BACKGROUND

I. *Referral and first detention hearing*

On July 22, 2024, K.G. (a two-month-old boy) came to the attention of the Riverside County Department of Public Social Services (DPSS) through an immediate response referral alleging physical abuse and general neglect. When Mother brought K.G. to the emergency room at Children's Hospital of Orange County (CHOC), bruising was found on K.G.'s face, arms, feet, and penis. K.G. also had a puncture wound on his lower left leg, a skull fracture, and potential fractures to the second and third ribs.

DPSS contacted CHOC, and the charge nurse told the social worker that a "CT scan was completed and found the child to have an acute non-displaced left parietal

2

fracture to the skull." There was no bleeding in K.G.'s brain, and he was referred to the hematology department to be screened for any blood disorders.

The Riverside Police Department contacted DPSS and informed the social worker that the skull fracture had been confirmed, and the rib fracture results were pending. A Riverside police officer told the social worker that Mother and the maternal grandmother were present at the hospital, and they were being "very cooperative." The maternal grandmother denied disciplining K.G. and denied that there was any domestic violence or substance abuse in the home. The maternal grandmother said that Father was a "'good guy'" and that the parents were not aggressive. The maternal grandmother also said that during K.G.'s delivery, K.G. "was stuck in the birth canal for a few hours." She stated that K.G. is "well-behaved" but had recently begun to "cry any time his legs and feet were touched." K.G. had been rejecting formula and was cranky. The maternal grandmother had no concerns about the parents' ability to care for K.G., and she said that Mother was "very protective" of him and "does not allow others to babysit or even hold" him.

DPSS reported that K.G. had a "small brownish-yellowish bruise to his left cheek, a blood blister on the bottom of his pinky toe on his right foot, a couple linear marks on both of his upper arms, and bruising to his penis."

During Mother's interview, she said that she had noticed coin-sized bruising "all over [K.G.'s] body." Two weeks later, Mother made an appointment for K.G. with his pediatrician, Dr. Payal Patel. Mother did not take K.G. to the emergency room, because

3

K.G. had been "act[ing] fine," and Mother did not want to expose K.G. to illness. Mother denied that K.G. had any bruising on the day of the appointment. She showed Dr. Patel a picture of an old bruise, and Dr. Patel was not concerned, because K.G. was "acting normal and gaining weight."

Mother said that three days after the appointment, she noticed "linear marks" on K.G.'s arm that were not present earlier that day. The maternal grandmother told Mother to take K.G. to the emergency room, and after trying Corona Regional Medical Center, Mother and the maternal grandmother took K.G. to CHOC. Mother said that she had not seen anyone mistreat K.G., and she denied knowing how K.G. got the blister on his toe. She said that the bruise on K.G.'s penis was not there the night before, and the bruise on K.G.'s cheek was caused when he hit his head on Mother's chest while she was holding him. Mother did not know how K.G.'s right ear had been bruised.

Mother said that the maternal grandmother and the maternal great-grandmother had cared for K.G. alone, but the bruising had already started by that time. Mother also said that Father had been alone with K.G. only "a couple [of] times." Mother described one occasion when Father was changing K.G.'s diaper in the night, and K.G. "may have been rolling around on the bed, but she was asleep and does not know if he fell or not." She said that she would have woken up if K.G. had cried.

Dr. Vinod Rao, a board-certified child abuse pediatrician, told the social worker that there had been no history of K.G. having injuries and that the skull fracture had been confirmed. Dr. Rao said that the results of the rib fracture tests were still pending, and an

4

x-ray showed that K.G.'s right foot may have fractured bones. Dr. Rao opined that the skull fracture could have occurred during "the difficult birth." Dr. Rao noted that the medical workup for K.G.'s bruising was pending, and he opined that "[t]he linear bruising on [K.G.'s] arms could have been from a forceful compression or an impact mechanism" and that the bruise on K.G.'s penis "could also be from forceful compression." Dr. Rao was "highly concern[ed]" about K.G.'s injuries, and he opined that they could be the result of abuse. Mother told Dr. Rao that the family had a history of osteogenesis imperfecta and Ehlers-Danlos syndrome, and Dr. Rao reported that this history could explain the bruising, "but it would not justify the fractures."

When interviewed by the social worker and two detectives, Father denied that he had ever physically disciplined K.G., that there was fighting in their home, that Mother or he abused any substances, and that he had any mental health issues. Father said that in June 2024, K.G. had a mark on his right thigh, and Father thought the baby carrier had pinched K.G.

Father denied seeing a bruise on K.G.'s penis, and he said that Mother learned of the bruise after they arrived at CHOC. Father said that Mother took K.G. to the pediatrician on the first available date, and the pediatrician was not concerned when Mother showed her a picture of one of K.G.'s old bruises. Father described an incident when K.G. was lying on the bed, and the family dog caused K.G. to roll off of the bed. Father "found [K.G.] on his back after he landed on the floor," and Father said that K.G. did not cry. Father believed that it happened "around the [time of K.G.'s] one month

5

check up with the pediatrician." Father said that the bed is low and "possibly a foot from the ground." Law enforcement reported that the bed was "approximately two feet high," and the floor of the bedroom was carpeted. Father also said that he had been left alone with K.G. only "a couple of times," and they were last alone together on the day of K.G.'s visit to the pediatrician. Father said that Mother and he were very concerned about the linear marks on K.G.'s arm.

Later on the same day as the referral, law enforcement interviewed Father again at his home. Father said that K.G. had "slight bruises," and Mother and Father took K.G. to Dr. Patel on July 18. Father said that the bruises were no longer visible at that time, so they showed pictures of the bruising to the doctor, and the doctor said that either K.G.'s seatbelt was too tight or the seatbelt had "clipped him." Father said that he and Mother had been "more careful" with K.G. and made sure not to pick him up "too hard," and they were "being cautious when placing him in the swing or jumper, and not tightening the buckles."

When law enforcement asked Father whether he had noticed any injuries on K.G. between the visit to the pediatrician and the visit to the emergency room, Father said that he did not see any bruises until he saw a mark on K.G.'s arm. Father "then clarified and said there was one located near his private area." Father "reiterated he had not seen any bruising on [K.G.] from Dr. Patel's visit until yesterday." Father said that Mother had woken him up late the night before after seeing a mark on K.G.'s arm during a diaper change. Mother told Father that she was taking K.G. to the emergency room in Corona.

6

Father also "changed his initial statement, and stated [that] he noticed the bruising on [K.G.'s] arm at [5:30 p.m.] last night when they switched his clothing." Father said that Mother noticed "a 'dot' on the right arm, and three lines on the left arm." Father described K.G.'s arm bruises as "three straight lines that were a dark red color." Father then said that he noticed bruising on K.G.'s genitals while Father was changing his diaper. Father brought the bruising to Mother's attention, and he did not know when Mother first noticed it.

Father said that K.G. "had fallen once two months ago" and that K.G. did not cry after the fall. Father stated that he was alone with K.G. the previous morning, and when he changed K.G.'s diaper, he did not notice any bruises other than the one on K.G.'s genitals. Father did not know if Mother was alone with K.G. that day, but he said that Mother was briefly alone with K.G. two days earlier when Father showered and got a drink of water. Father was not concerned about Mother's ability to parent K.G.

The maternal great-grandmother reported that she had recently cared for K.G. alone for 30 minutes. She denied seeing any bruising on K.G. at that time, and she "was aware of the concerns as [Mother] had shown her pictures of previous bruises on [K.G.]" The maternal great-grandmother "indicated Ehlers-Danlos syndrome is genetic in her family," and she denied having any concerns about the parents' ability to care for K.G.

The day after Mother took K.G. to the emergency room, DPSS obtained a protective custody warrant to remove K.G. from the parents' care. K.G. was placed with the maternal grandfather.

7

That day, Dr. Patel contacted DPSS. Dr. Patel told DPSS that the parents had brought K.G. in for all well-baby appointments, and during a checkup on July 18 "[M]other asked Dr. Patel if bruising was normal and pointed to [K.G.'s] lower back." Dr. Patel said that she observed "Mongolian spots" on K.G.'s lower back, and she told Mother that the spots were normal. Dr. Patel denied observing any marks or bruises on K.G. at the appointment.

DPSS filed a juvenile dependency petition alleging that K.G. is a person described by section 300, subdivisions (a), (b), and (e), because K.G. suffered extensive unexplained injuries including a skull fracture, rib and foot fractures, and unexplained bruising to his penis, ear, arms, and face that would not ordinarily be sustained except as a result of the unreasonable or neglectful acts of the parents or physical abuse.

At the detention hearing, the court stated that "these are unusual facts" and that it was "clear [from] the report" that the "parents are really wracking their heads to figure out what is going on with this little one." The juvenile court declined to detain K.G. and ordered that he remain released to the parents. The court set the jurisdiction and disposition hearings for the following month.

II. *Criminal prosecution, additional medical evidence, and second detention hearing*

Four days after the detention hearing, the parents were arrested for willful child cruelty. (Pen. Code, § 273a, subd. (a).) Father said that "they were worried about the bruising" and were waiting for test results "to see if there was a deficiency." He denied seeking medical attention for K.G. before his visit to the pediatrician, and he said that the

8

parents "were trying to figure out if he was being picked up or grabbed too hard." Father said that he did not notice any injuries on K.G.'s body until they changed his clothes on Sunday. He said that K.G. showed no leg discomfort that day, and he denied hurting K.G. or doing anything to bruise him.

DPSS received K.G.'s medical report with an addendum attached by Dr. Rao. Dr. Rao noted that K.G. was bruised "'in locations that are relatively protected, including the ears, soft portion of the facial cheek, and penis/foreskin as well as had patterned bruises on both upper arms; all of which are not typical of medical conditions associated with bruising.'" Dr. Rao opined that K.G.'s fractures were "'not typical of osseous (bone) medical conditions.'" The report did not identify any "indication of medical conditions that would plausibly cause or contribute to [K.G.'s] injuries," but completion of medical evaluation was indicated, including "hematologic studies, endocrinologic studies, and potentially genetic studies in collaboration with recommendations from Pediatric Hematology and Pediatric Genetics." Dr. Rao opined that K.G.'s skull fracture could have been caused at birth or by falling from the bed, but it could also be a result of physical abuse. Dr. Rao reported that it was "not typical for children of [K.G.'s] age and development to sustain bruises and/or fractures from routine handling and care activities in the absence of any identified condition that would possibly explain such findings." Results from multiple tests and evaluations were pending.

Dr. Rao reported that "[b]ased on the information currently available, [K.G.'s] bruises and fractures are highly concerning for inflicted injury and child abuse, pending

9

completion of the remainder or his medical evaluation." Dr. Rao noted that the results of the laboratory studies recommended by the hematologist were normal and that "'there was no identified hematologic medical condition that would plausibly cause or contribute to [K.G.'s]' injuries." The pediatric geneticist identified "no 'obvious features of either classic or vascular type EDS [Ehlers Danlos Syndrome] at this time based on his examination findings and provided family history.'" Dr. Rao reiterated that "'all of the types of fractures [K.G.] was identified to have are not those that would be typical of osseous (bone) medical conditions,'" and he added that "'the Pediatric Geneticist indicated fractures would not be associated with EDS; however, they indicated that testing for osteogenesis imperfecta (OI) would be sent,'" although K.G. was documented not to have many of the features associated with OI. Regarding Father's suggestion that K.G. could have been bruised by the straps on his baby carrier, Dr. Rao said that "'[i]t was reported that [K.G.] was last in the baby carrier greater than 1 month prior and it would thus not be a plausible cause.'" Dr. Rao recommended that pictures of the carrier be made available for his review.

Dr. Rao again opined that although K.G.'s traumatic birth or fall from the bed could not be excluded as the cause of the skull fracture, he believed that physical abuse likewise could not be excluded. K.G.'s "'other fractures would not be possible to have occurred from birth or related to the history of a fall from the bed approximately 1 month prior.'"

Dr. Rao indicated that K.G. had "a 'classic metaphyseal lesion (CML) type fracture of the distal left tibia.'"  K.G.'s injury was discovered when his grandfather took him to his pediatrician for a follow-up appointment after he noticed a decrease in K.G.'s left leg movement.  According to Dr. Rao, a CML was "'a type of fracture that has a high specificity for abuse, meaning it rarely occurs in accidental settings.  CMLs can occur from tensile stresses (as would occur in traction of the limb) and may also occur from shearing stress (as would occur in acceleration/deceleration movements of the limb)."  Dr. Rao explained that "a CML can resorb and resolve without signs of healing, so this type of fracture can be more difficult to narrow a time frame for."  Dr. Rao concluded that there "[had] not been any plausible cause for the CML reported."

Dr. Rao was also concerned about the caregiver's inconsistent statements regarding the cause of K.G.'s bruised penis.  Dr. Rao noted that the history Father provided to the urologist differed from what Mother told Dr. Rao and other staff at the hospital.  Father told investigators that he did not see a bruise on K.G.'s penis when Father changed the child's diaper, but a few days later he told the urologist that the bruising began the day before the reported diaper change and "'worsened for a few days, and began to improve today.'"  Dr. Rao said this admission "was the first time any caregiver reported bruising being present earlier than when they arrived to the hospital."  Dr. Rao expressed "significant concern for the safety and well-being of [K.G.], without intervention by CPS and provision of services to help prevent future harm and injury."

11

DPSS filed a first amended petition to include allegations that K.G. did not have an underlying medical condition and that the parents were arrested for willful child cruelty. The petition also added an allegation under subdivision (b) of section 300 that the parents have an open case with children's services as to K.G. due to general neglect and physical abuse and that the parents were receiving family maintenance services.

The parents made bail, and they agreed to allow K.G. to remain with the paternal grandparents for a couple of days. DPSS then obtained another protective custody warrant to remove K.G. from his parents' care.

DPSS received an updated addendum from Dr. Rao. Dr. Rao reported that K.G. did not have the genetic markers for osteogenesis imperfecta and that the pediatric geneticist indicated that additional testing for OI or EDS was not medically indicated and "currently there is not a strong suspicion clinically for OI or EDS." The pediatric geneticist indicated that K.G. could have follow-up testing in six months or even sooner if there was any new clinical information or fractures that indicated a need for an earlier reevaluation. Dr. Rao noted that Mother had provided an article about EDS in children. Dr. Rao reported that the article was "not accurate related to fractures and Ehlers-Danlos Syndrome; to the contrary, fractures are actually not supported to occur for children with Ehlers-Danlos Syndrome." Dr. Rao noted that there were "no prior peer-reviewed case series demonstrating increased fracture risk in EDS type III or classic EDS type." Dr. Rao stated that "to the contrary, peer-reviewed literature regarding EDS does not list fracture as a typical concern, except with rare cases of EDS/OI overlap diagnosed with

12

genetic testing." Other than the article cited by Mother, there were "no cases in the medical literature of a child with EDS/OI overlap presenting with fractures suspicious for child abuse." Dr. Rao also pointed out that more recent articles about EDS specify that "'there is no convincing evidence that hypermobility EDS is associated with osteoporosis or fragility fractures, especially in children.'"

Dr. Rao expressed concern for K.G.'s safety and noted that "'[i]f an individual reported being the only caregiver for [K.G.] from the time when he had no bruises to the time when he had bruises that would indicate the bruises to have occurred in that individual's care.'" Dr. Rao reported that other than Mother and Father, the maternal grandmother cared for K.G. "approximately 1 month prior to presentation," and the parents first noted the bruises weeks after the grandmother cared for the child.

DPSS contacted Dr. Rao to confirm his findings. Dr. Rao said that "based on the information he ha[d] at [that] time there [was] no other explanation other than inflicted injury and child physical abuse."

The social worker interviewed Father by phone in early August 20224. Father denied injuring K.G. and said that neither he nor Mother would ever hurt K.G. Father said that K.G. used an "'owlet sock'" so that the parents could monitor his vital signs, and the parents noticed "'a red line'" on the child's foot because the sock did not fit correctly. Father believed that K.G.'s fractures were caused by his traumatic birth, and he said that "no doctor confirmed or suspected any fractures at the time of birth." Father also confirmed that K.G. once fell from the bed to the floor at 4:00 a.m. Father denied

13

that K.G. cried after the fall, and he said that Mother was asleep throughout the event. Father said that he had sent a text message to Mother afterward asking her to monitor K.G.

Father said that the parents did not take K.G. to the doctor after the fall, but they had a pediatrician's appointment scheduled and "'everything checked out.'" Father said that he did not notice any bruises or see K.G. showing any signs of discomfort between early July and the day of the appointment with the pediatrician. Father reported that he "'believe[d]'" that they had informed the doctor about the fall. Father denied that K.G. had any bruises at the visit to the pediatrician. Father said that they noticed the marks on K.G.'s arm a few days after the doctor's appointment, and the parents initially agreed to take the child back to the pediatrician. But the parents ultimately decided Mother should take K.G. to the emergency room. Father said that Mother was K.G.'s primary caregiver during the day while Father worked, and that Father has only cared for K.G. alone about "three times." Father had no concerns about Mother caring for K.G.

Mother was "'shocked'" by Dr. Rao's findings and asked to have K.G. tested for EDS. The social worker explained that EDS is diagnosed through evaluations by medical specialists, there is no single test for the disease, and a pediatric geneticist determined that K.G. showed no indication of EDS and recommended no further testing. Mother said that the parents had noticed bruises on K.G.'s body "'sometime in June'" and that K.G.'s pediatrician was not concerned by the bruises that they showed her. Mother said that the pediatrician told the parents to "'check the car seat to make sure there's nothing

14

on the side rubbing against [K.G.'s] arms or anything rough.'"  Mother confirmed that she was K.G.'s primary caregiver other than an occasion when she left him with the maternal great-grandmother.  Mother denied having any concerns about Father caring for K.G.

Because of the amended petition and the new protective custody warrant, the court conducted a second detention hearing.  The court again released K.G. to the parents, but this time on the condition that they agree to a safety plan under which the paternal grandparents would care for the child.  The court ordered that the parents were to have only supervised contact with K.G. in the grandparents' home.

III.     *Jurisdiction and disposition*

DPSS filed its jurisdiction and disposition report on August 22, 2024.  It reported that on August 6, 2024, the social worker had informed the parents that the pediatric geneticist, Dr. Neda Zadeh, had stated that "although medically at this point she would not recommend additional testing due to absence of indication of an underlying medical condition as a source, if [the] parents [continue] to request further testing, there [are] some additional tests she can offer."  Dr. Zadeh warned that the testing process "[could] take up to two months."  The parents told DPSS that they wanted a second opinion from another medical provider.

The following week, DPSS received an updated addendum from Dr. Rao.  Dr. Rao reported the following findings regarding a bone survey conducted on August 5, 2024: "Healing fractures of the left lateral third, fourth, fifth and sixth ribs are noted.  There is a

15

subtle densities at the right fourth and fifth lateral ribs that could represent a healing fracture or summation of shadows." Regarding K.G.'s leg, Dr. Rao reiterated that there was a CML tear on the left tibia and that "[r]etrospectively this was present on the prior study but is better appreciated on today's exam due to the healing changes." Dr. Rao indicated that "[t]here is also a healing classic metaphyseal lesion of the distal left tibia (previously known as a corner fracture)."

Regarding K.G.'s foot, Dr. Rao reported that K.G. had a "traumatic, closed, complete, mildly displaced fracture involving the distal aspect of the third right metatarsal." Dr. Rao reported the presence of "interval bridging callus formation," which indicated that the fracture was healing. Dr. Rao also noted the possibility of a fracture of another bone in K.G.'s foot—"subtle sclerosis of the distal right fourth metatarsal that could represent a healing occult fracture." The proximal right fibular metaphysis showed "a subtle sclerotic transverse line" that "could represent a healing occult fracture." Dr. Rao concluded, in light of all of the accumulated medical evidence, that K.G.'s injuries were caused by "inflicted injury and child physical abuse." Dr. Rao noted that "the report that [K.G.] has not had any new/additional bruises since involvement of the court and since being in different care environments further supports that he does not have an underlying medical condition that would plausibly cause or contribute to the bruises he was initially noted to have."

Regarding K.G.'s leg, Dr. Rao stated that K.G.'s leg fracture was not a typical injury that would have occurred while the child's blood was drawn at the hospital, but he

16

encouraged DPSS to obtain additional details from the parents. Dr. Rao recommended investigation into the "time during the hospitalization [the parents] reported observing the proposed concerns, what specific location of [K.G.'s] body they were referring to, how they observed blood was being obtained, and details regarding what they observed that they perceived could be a cause for a fracture." Regarding the genetic testing requested by the parents, Dr. Rao stated that "regardless of additional testing, a diagnosis of Ehlers Danlos Syndrome would not explain fractures or the type and distribution of bruises." Dr. Rao noted that K.G. "had an extensive medical evaluation and no medical conditions were identified that would plausibl[y] cause or contribute to his fractures."

Dr. Rao reported that all of K.G.'s fractures besides the skull fracture "were acute at the time of the initial skeletal survey," so the fractures to K.G.'s foot, ribs, and leg "would thus be consistent with having occurred within the 14 days preceding that study." Dr. Rao noted that signs of healing "can potentially take up to 14 days to be visualized on radiographs," and acute fractures that did not show signs of healing on the skeletal survey were therefore consistent with having occurred within 14 days before the survey. Dr. Rao opined that all of the fractures other than the skull fracture showed no signs of healing as of July 22, 2024, so "those fractures would not be consistent with having occurred on or around birth nor would those be consistent with having occurred on or around the time of the fall that was reported to have occurred 1 month prior to presentation." Dr. Rao recommended that the parents contact the CHOC pediatric genetics office to coordinate further testing for K.G. He cautioned that if the parents

17

elected to go to a different specialist they should choose "an appropriate and equivalent provider with training in Pediatric Genetics," and any additional testing or consultations should be provided for his review.

In August 2024, a pediatric neurologist at CHOC assessed K.G. and recommended no further testing, but a follow-up was scheduled. Mother reported that she scheduled an appointment for K.G. to be seen by a doctor at the Riverside Medical Clinic and to be referred to a pediatric geneticist to have the child assessed for EDS.

DPSS attempted to obtain K.G.'s medical records from CHOC, but Mother declined to sign a release of information until she spoke to her attorney.

In September 2024, Mother informed DPSS that she was scheduled to meet with a rheumatologist the next day, and she agreed to share the doctor's and the clinic's information with DPSS. Two days later, Mother informed DPSS that "the rheumatologist indicated [she] may have a form of EDS." Mother was waiting for a referral to a geneticist.

K.G. was thriving in the grandparents' care. The paternal grandmother reported that K.G. was eating and sleeping well and stated that "there ha[d] not been any new marks, bruising, or any other issues with the child" since he was placed in their care.

DPSS had initially recommended that reunification services be ordered for the parents, and the parents agreed to participate in predisposition services. The parents enrolled in a parenting class and were scheduled to begin during the second week of September. But DPSS filed an addendum report recommending that the parents be

18

bypassed for reunification services under subdivisions (b)(5) and (b)(6) of section 361.5. DPSS noted that the parents refused to accept that K.G.'s injuries were the result of inflicted abuse, and as a result reunification services would not change their conduct.

A victim advocate from the district attorney's office reported that the People had filed felony charges against both parents alleging three counts of child cruelty and one count of torture.

In October 2024, the paternal grandmother brought K.G. to DPSS's office. The social worker confirmed that K.G. was free of any marks or bruises that would indicate child abuse or maltreatment. K.G. had a scratch on his left nostril, a tiny round cut over his nose, and a small, round, red bruise on his right inner foot. The paternal grandmother attributed the bruise to K.G.'s baby monitoring sock, and she demonstrated how she came to that conclusion. The social worker noted that the bruise was consistent with the paternal grandmother's explanation. The paternal grandmother reported that Mother was present at K.G.'s last pediatric appointment and that the parents visited K.G. daily.

Mother said that she had completed an individual counseling intake, but she had not yet begun anger management. She also had scheduled an anger management intake appointment.

The juvenile court conducted a pretrial conference, at which Mother's counsel stated that she had been in contact with a medical expert and had "sent in some very recent updates." Mother's counsel requested a continuance to allow the expert to review the updates. Father's counsel noted that the criminal court issued a criminal protective

19

order (CPO) preventing the parents from having any contact with K.G., but she indicated that the CPO could be modified if DPSS were authorized to monitor the parents' visits. Father's counsel reported that she was in touch with several medical experts.

The next day, Father contacted DPSS and reported that he had not been able to begin anger management, because he could not reach anyone at the program. The social worker agreed to contact the service provider.

The following week, the juvenile court authorized the paternal grandparents to supervise three-hour visits for the parents on Thanksgiving and Christmas, and DPSS was to supervise visits for the parents twice per week.

In December 2024, the social worker accompanied Mother and the paternal grandmother to K.G.'s circumcision consultation. There were no marks or bruises on K.G.'s body.

The juvenile court set the jurisdiction and disposition hearing for January 2025. Father's counsel and Mother's counsel represented that there would be no testimony at trial, and the social worker's presence was not required.

Father and Mother completed their parenting program, and they continued to participate in individual counseling. Mother also continued to participate in anger management, and the parents visited K.G. at DPSS's office. DPSS noted that the parents were attentive to K.G. during visits, they aided in his development with tummy time and assisting him in rolling over, and they brought activities for him.

At the jurisdiction and disposition hearings, no witnesses testified, and the parents did not introduce any evidence. DPSS's counsel asked the court to sustain the allegations in the petition and to follow DPSS's recommendation for disposition. Minor's counsel joined the county's argument and noted that the facts of the case supported jurisdiction under section 300, subdivision (e), because the child sustained severe injuries while in the parents' care.

Mother's counsel argued that there was no concrete evidence that K.G. suffered any rib fractures. Mother's counsel contended that the court could not find that the parents had neglected K.G., because Mother took him to the emergency room at Corona Regional Medical Center. Mother's counsel also argued that there was no evidence that K.G. had suffered a foot fracture, claiming that "it was a tibia" that was fractured. And she pointed out that Mother took K.G. to his pediatrician, but the doctor could not discern any irregularities. Mother's counsel argued that there was no evidence that the parents were negligent and that the court could not find either count true by a preponderance of the evidence. Counsel said that "to find neglect, we would have the parent not addressing the issues, seeing a child suffer, seeing a child not being able to walk or put weight on a limb or crying in agony if the child were in pain and ignoring it." Counsel also denied that K.G.'s injuries constituted severe physical abuse, and counsel claimed that the child's injuries "may have another explanation other than nonaccidental trauma."

Father's counsel argued that Mother had continued to seek care despite being told by doctors that "everything was fine." Counsel contended that Mother's actions did not

21

"align with that of a parent who is harming her child. The [severe physical abuse] allegation that suggests that [M]other harmed him or should have known someone [was] harming him, it doesn't line up."

The juvenile court took the matter under submission, and in February 2025, the court found the allegations true by a preponderance of the evidence and declared K.G. a dependent. The court found by clear and convincing evidence that the requirements for removal under section 361 were satisfied as to both parents, and the court removed K.G. from both parents' custody. The court also stated that "the parents are persons described by Welfare & Institutions Code [s]ection 361.5[, subdivisions] (b)(6) and (b)(5), and reunification services are denied, as those are not in the child's best interest." The minute order states that the court found by clear and convincing evidence that the parents were described by section 361.5, subdivision (b)(5) and (b)(6). The court set a selection and implementation hearing pursuant to section 366.26 and reduced the parents' visits to once per month.

## DISCUSSION

I.    *Sufficiency of the evidence supporting the jurisdictional findings*

Mother and Father argue that the record does not contain substantial evidence to support the court's jurisdictional findings. We disagree.

A challenge to the sufficiency of the evidence supporting a jurisdictional finding requires us to determine if substantial evidence, contradicted or not, supports it. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) We review the record in the light most favorable

22

to the court's determination and draw all reasonable inferences in support of it. (*Ibid.*) We do not reweigh the evidence or exercise independent judgment but merely determine whether the evidence is sufficient to support the finding. (*Ibid.*)

The parents' substantial evidence challenge fails because the record contains ample evidence supporting the juvenile court's finding of severe physical abuse. First, the evidence showed that in addition to numerous unexplained bruises and other marks, K.G. had suffered several bone fractures. The uncontested medical evidence confirmed that K.G. had suffered multiple rib fractures, a fractured left tibia, and at least one fractured bone in his foot (in addition to the skull fracture, which was the only injury that might have been caused by K.G.'s difficult birth).

Second, there was no medical evidence that K.G. had any medical condition that might explain the bruises and fractures, and all of the available medical evidence indicated that he had no such condition. After K.G.'s injuries were discovered at the emergency room, K.G. was referred to hematology for identification of any potential blood disorders, but the results of the studies were normal and did not identify any conditions that could "cause or contribute" to K.G.'s injuries. The pediatric geneticist noted that K.G.'s fractures would not be associated with Ehlers-Danlos syndrome, and K.G. did not have many of the features associated with OI. Dr. Rao concluded, in light of all of the information gathered from hematology and genetics, that K.G.'s injuries (with the possible exception of the skull fracture) were caused by physical abuse. Dr. Rao

concluded that Mother's claims regarding OI and Ehlers-Danlos syndrome did not explain the fractures.

Third, the record contains no evidence that anyone other than the parents could have inflicted K.G.'s injuries. When DPSS received the immediate response referral, K.G. was just two months old. Mother was K.G.'s primary caregiver, but Father cared for K.G. alone sometimes as well. The parents never identified any other caregiver (or anyone else) who could have inflicted K.G.'s injuries within the relevant timeframe.

Fourth, K.G. did not suffer any additional fractures or unexplained marks or bruises once he was no longer in the parents' care.

Taken together, those four points—the multiple fractures, the lack of any medical condition that would explain them, the lack of any possible perpetrators other than the parents, and the absence of any additional factures after K.G. was no longer in the parents' care—overwhelmingly support the juvenile court's jurisdictional findings.

The standard of review requires us to reject the parents' contrary arguments. For example, Mother argues that she would not have sought medical care for K.G. if she were abusing him. But the juvenile court was not required to draw that inference, and on substantial evidence review we must draw all reasonable inferences in support of the court's findings, not against them. (*I.J.*, *supra*, 56 Cal.4th at p. 773.) Father argues that because the juvenile court did not find a prima facie case to support detention, the court could not find the jurisdictional allegations true. But Father cites no authority for the proposition that the court's findings at the detention hearings were binding on the court at

the jurisdiction hearing, and we are aware of none. (We also note that the effect of the court's rulings at the second detention hearing was that K.G. was detained—the parents were no longer K.G.'s caregivers and were limited to monitored visits.) The court's determinations at the detention hearings do not change the fact that the record contains more than sufficient evidence to support the court's jurisdictional findings.

For all of these reasons, the parents' challenge to the sufficiency of the evidence supporting the jurisdictional findings lack merit.

II.     *Sufficiency of the evidence supporting the removal order*

Mother and Father argue that there is insufficient evidence to support the juvenile court's order removing K.G. from their custody at disposition. The parents also argue that the court erred by failing to state facts supporting the order. We disagree.

To order a child removed from their parents' physical custody, the juvenile court must find by clear and convincing evidence that (1) there "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child in the parents' home, and (2) "there are no reasonable means by which the [child's] physical health can be protected without" removal. (§ 361, subd. (c)(1).) A jurisdictional finding under subdivision (e) of section 300 constitutes prima facie evidence that a child cannot safely remain in the custody of a parent with whom the child resided at the time of injury. (§ 361, subd. (c)(1).)

We review the court's removal findings for substantial evidence (*In re R.T.* (2017) 3 Cal.5th 622, 633), taking into account the level of confidence that the "clear and

25

convincing" evidence standard demands (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995 (*O.B.*)).  The question before us "is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."  (*Id*. at pp. 995-996.)  We "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Id*. at. p. 996*.*)

The record contains substantial evidence supporting the juvenile court's removal findings.  First, the court took jurisdiction over K.G. pursuant to section 300, subdivision (e).  As a matter of law, that finding (which was supported by substantial evidence) constitutes prima facie evidence that K.G. could not safely remain in the parents' care. (§ 361, subd. (c)(1).)

Second, for the same reasons that the record contains ample evidence supporting the jurisdictional findings, it also contains ample evidence supporting the removal findings.  The evidence overwhelmingly establishes that the parents inflicted multiple bone fractures on K.G., a two-month-old infant who was incapable of protecting himself or reporting the abuse that he was suffering.  On that basis, the juvenile court could reasonably infer that it was highly probable that the physical abuse could continue if K.G. were not removed from the parents' care and that there were no reasonable means to protect him without removal.

Mother argues that the court erred by failing to state facts supporting the removal order.  But Mother fails to argue that the error was prejudicial, and any such argument would fail.  "'[C]ases involving a court's obligation to make findings regarding a minor's change of custody or commitment have held the failure to do so will be deemed harmless where "it is not reasonably probable such finding, if made, would have been in favor of continued parental custody."'" (*In re L.O.* (2021) 67 Cal.App.5th 227, 247.)  Given the uncontested medical evidence that K.G.'s injuries were caused by physical abuse and the lack of evidence of any possible perpetrator other than the parents, it is not reasonably probable that the court would have placed K.G. with one or both parents if it had been required to be more explicit about the facts supporting removal.  Consequently, any error in failing to state those facts was harmless.

## III.    *Bypass of reunification services*

The parents argue on several grounds that the juvenile court erred by bypassing them for reunification services.  None of the parents' arguments shows prejudicial error.

"Reunification services must be provided to the mother and statutorily presumed father of children who have been removed from their parents' custody, unless a statutory exception applies. [Citations.]  The statutory exceptions are contained in subdivision (b) of section 361.5, which provides that '[r]eunification services need not be provided' if the court finds 'by clear and convincing evidence' that any of 17 enumerated bypass provisions apply." (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141.)  Section 361.5, subdivision (b)(5) applies if the "child was brought within the jurisdiction of the court

27

under subdivision (e) of section 300" because of the parents' conduct.  (§ 361.5, subd. (b)(5).)  Subdivision (b)(6) of the statute applies if (1) the child was adjudicated a dependent "as a result of . . . the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent," and (2) "it would not benefit the child to pursue reunification services with the offending parent."  (§ 361.5, subd. (b)(6)(A).)  If subdivision (b)(5) of section 361.5 applies, then the court "shall not order reunification" unless the court "finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent."  (§ 361.5, subd. (c)(3).)

We review an order bypassing reunification services for substantial evidence (*Amber K. v. Superior Court* (2006) 146 Cal.App.4th 553, 561), taking into account the level of confidence that the "clear and convincing" evidence standard demands (*O.B.*, *supra*, 9 Cal.5th at p. 995).

As with the jurisdictional findings and the removal findings, the record contains ample evidence to support a bypass finding by clear and convincing evidence under subdivision (b)(5) of section 361.5.  It was undisputed that K.G. is a child under five years old, and the evidence overwhelmingly established that the parents had subjected him to severe physical abuse—he suffered multiple bone fractures in their care, there was no medical evidence of any medical condition that would explain the fractures, there was no evidence of an alternative perpetrator who might have inflicted the injuries, and K.G.

28

did not suffer any additional fractures (or unexplained bruises or marks) once he was no longer in the parents' care. The jurisdictional allegation under subdivision (e) of section 300 was therefore supported by clear and convincing evidence, so the bypass finding under subdivision (b)(5) of section 361.5 was supported by clear and convincing evidence as well. As a result, the juvenile court was required to bypass the parents unless the court made the necessary countervailing findings under subdivision (c)(3) of section 361.5 (e.g., services would be likely to prevent reabuse, or failure to order services would be detrimental), which the court did not do. And to the extent that the record contains any evidence that might have supported such countervailing findings, it was not so uncontradicted and unimpeached as to compel a finding in the parents' favor, so any challenge to the court's failure to make such findings cannot succeed. (*In re Raul V.* (2022) 82 Cal.App.5th 290, 301 (*Raul V.*).)

The parents' contrary arguments lack merit. First, Mother argues that the juvenile court erroneously applied the preponderance of the evidence standard instead of the clear and convincing evidence standard when it bypassed the parents for reunification services. Nothing in the record affirmatively indicates that the court applied the preponderance of the evidence standard, however, and the minute order expressly applies the clear and convincing evidence standard. It is true that the court failed to state the standard of proof orally when announcing its ruling. But as DPSS points out, if the standard of proof "is well settled, it is presumed that the trial judge applied the appropriate standard and no articulation is required." (*In re Bernadette C.* (1982) 127 Cal.App.3d 618, 625.) Bypass

29

of reunification services has been governed by the clear and convincing evidence standard for over 20 years (Assem. Bill No. 1695 (2001-2002 Reg. Sess.) § 11.3), so we presume that the court applied that standard.

Second, the parents challenge the court's finding that subdivision (b)(6) of section 361.5 applies. But because the parents do not challenge the bypass finding under subdivision (b)(5) of section 361.5, any error concerning subdivision (b)(6) was harmless. As we have already explained, the juvenile court's well-supported finding under subdivision (b)(5) of section 361.5 was sufficient on its own to require the court to bypass reunification services. (§ 361.5, subd. (c)(3); see *In re Madison S.* (2017) 15 Cal.App.5th 308, 324 ["only one valid ground is necessary to support a juvenile court's decision to bypass a parent for reunification services"].)

Third, Mother contends that the juvenile court erred by denying reunification services because it was in K.G.'s best interest for the court to order reunification services. The argument is relevant to bypass under subdivision (b)(6) of section 361.5. (See § 361.5, subd. (c)(2) ["The court shall not order reunification [services] for a parent . . . described in paragraph . . . (6) . . . of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child"].) But the argument fails to address the requirements for overriding a bypass finding under subdivision (b)(5) of section 361.5, which prohibits the court from ordering reunification services unless the court "finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try

30

reunification will be detrimental to the child because the child is closely and positively attached to that parent." (See § 361.5, subd. (c)(3).) Mother does not argue that the record would have supported (let alone compelled) such findings. And as we have already explained, insofar as the record contains any evidence that might support such findings, the evidence is not so uncontradicted and unimpeached as to compel findings in the parents' favor. (*Raul V.*, *supra*, 82 Cal.App.5th at p. 301.)

For all of these reasons, the parents have failed to show that the juvenile court committed any prejudicial error in bypassing them for reunification services.

DISPOSITION

The requests for a stay are denied. The petitions are denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

MILLER
Acting P. J.

CODRINGTON
J.

31